335 F.2d 724
 118 U.S.App.D.C. 302
 James C. OLIVER, Appellant,
v.
UNITED STATES of America, Appellee.
George F. WILLIAMS, Appellant,
v.
UNITED STATES of America, Appellee.
Robert A. CRUMP, Appellant,
v.
UNITED STATES of America, Appellee.
Larry L. MASON, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 17937, 17938, 17939, 17940.
 United States Court of Appeals District of Columbia Circuit.
 Argued Dec. 16, 1963.
Decided June 26, 1964.
 
 Mr. Charles Jay Pilzer (appointed by this court), Washington, D.C., for appellant in No. 17937.
 Mr. Werner Kronstein (appointed by this court), Washington, D.C., for appellant in No. 17938.
 Mr. Arnold M. Lerman (appointed by this court), Washington, D.C., for appellant in No. 17939.
 Mr. Leonard N. Bebchick (appointed by this court), Washington, D.C., for appellant in No. 17940.
 Mr. Paul R. Walsh, Atty., Dept. of Justice, with whom Messrs. David C. Acheson, U.S. Atty., Frank Q. Nebeker, Asst. U.S. Atty., and Harold K. Schroeder, Atty., Dept. of Justice, were on the brief, for appellee.
 Before WILBUR K. MILLER, BURGER and WRIGHT, Circuit Judges.
 BURGER, Circuit Judge.
 
 
 1
 On June 18, 1962, a grand jury in the United States District Court for the District of Columbia returned an indictment charging that the appellants 'carnally knew and abused a female child named Diane Wright, who was then under sixteen years of age, that is to say, about fourteen years of age.'
 
 
 2
 After mental examinations of three appellants, the final report of which was filed March 1, 1963, the trial began late that month and resulted in a verdict on March 29 finding Oliver, Williams and Crump guilty as charged, and finding Mason guilty of assault with intent to commit rape. The three found guilty of rape were sentenced to imprisonment for a period of nine to thirty years, and Mason received a sentence of from four to fifteen years. All appeal.
 
 
 3
 Although the appellants were tried together,[1] each has filed his own appeal and each has been represented on appeal by his own counsel appointed by this court. These attorneys have ably and diligently responded to their appointment: they have filed voluminous briefs, and reply briefs as well, and were permitted to make oral arguments more lengthy than those usually allowed by us.
 
 
 4
 Evidence for the Government disclosed a vicious and wholesale rape of a fourteen-year-old girl. Diane Wright, the prosecutrix, testified that on the evening of May 4, 1962, while walking with a friend near a park in the Northeast section of Washington, a rowdy crowd of young men accosted her, put her companion to flight and brutally raped her; the details of the attack are too revolting to be fully set out in a published opinion of the court. Suffice it to say that she described in detail the vicious multiple attacks, identified each of the four appellants as those who had raped her, and said the appellant Crump threatened that if she cried out she would be taken into the woods and hanged.
 
 
 5
 Diane testified that after assault by the fourth of the appellants, she heard her father and some others calling from the direction of a lighted area, whereupon someone shouted that the police were coming and the boys ran off into the woods. She was taken home by her father and a neighbor and, in response to her father's inquiry, she tearfully said she had been raped. The police were summoned and she told them a group of boys had attacked her and, responding to the officers' questions, said she would recognize the boys if she saw them again. She was then taken to a hospital and examined. While on the stand, she identified the garments she was wearing the night of the attack.
 
 
 6
 A neighbor testified that on the evening of May 4, 1962, she and Diane's father were looking for the girl and, when the father directed the headlights of his car into a park near Anacostia Avenue, Diane came stumbling out of the bushes, crying and asking for her mother. She appeared 'half way passed out' and her clothes were dirty and disarranged.
 
 
 7
 Diane's father testified that on the evening of May 4, 1962, he went to look for her and that a few seconds after he cast his car headlights into a park near Anacostia Avenue Diane appeared. She was crying and calling for her mother, her clothes were very dirty, and there was straw on her back. Later, at their home, in answer to his question, she told him she had been raped. Diane's mother testified that when she first saw her daughter on the evening of May 4, 1962, Diane appeared stunned, her hair was 'in a wrecked condition' and her clothes were filthy. She helped Diane disrobe and then took her to the hospital. Mrs. Wright also identified the items of apparel that Diane had been wearing the night of the assault.
 
 
 8
 A resident at D.C. General Hospital testified that he examined Diane Wright on the evening of May 4, 1962; his testimony and that of a witness from the Federal Bureau of Investigation, who had examined certain articles of clothing allegedly worn by Diane that evening, abundantly corroborated her claim of rape.
 
 
 9
 Such, in brief, was the evidence of the prosecuting witnesses and of those whose testimony corroborated her statement that statutory rape had been committed. In addition to the foregoing, and in corroboration of Diane's identification of the four appellants as her attackers, the Government offered the testimony of several police officers that each of the appellants voluntarily admitted participating in the multiple rapes:
 
 
 10
 1. Diane had stated to police that one of the attackers had said he was related to 'Tucson.' At about 8:30 a.m. on May 5, Detective Eger was approached on a street by a young man; for reasons not entirely clear the detective asked him if he were 'Tucson.' When he admitted he was 'Tucson' he said his real name was James Oliver. Eger arrested him, later explaining the basis for arrest as an old warrant which he knew to be outstanding, charging an offense unconnected[2] with the rape of Diane. The arrest of Oliver was made about 8:40 a.m.; he was taken to a precinct station shortly before 9:00 a.m. and about 9:20 a.m. admitted to Officers Connor and Kuntz that he had criminally assaulted Diane Wright on the evening of May 4.
 
 
 11
 2. Williams was arrested at his home at 10:00 a.m. May 5, 1962, on information obtained from Oliver while he was in custody, and arrived at the precinct station about 10:20 or 10:25. An officer testified that about five or ten minutes after he was brought in Williams admitted he was the fourth to have intercourse with the victim. He confessed more fully at 11:00 a.m.
 
 
 12
 3. The appellant Crump was arrested at his home at 6:23 a.m. May 6, 1962, because he had been implicated by two men already in custody in the Diane Wright case. Immediately upon arrival at the precinct station, at about 6:30 a.m., after he had been advised of his rights, Crump said, 'I want to get this off my chest,' and admitted participating in the rape of Diane Wright. Then, with his own hand, Crump prepared the following statement:
 
 
 13
 'I Robert Crump was with Tooson (James Oliver), Larry (Mason), George (Williams), Pete, Clarence Baker, Skip, Godfrey Foster. I Robert Crump said that this boy named Timmy pointed his finger at me and showed me to the wood with the girl. Then I had sexual. The girl didn't scream; she didn't put up a fight. The boy names that had relationship was Tooson, Larry, George, Pete and Skip. She was willing to give up. When her mother called, she didn't answer. 'I have give this statement in the presence of Godfrey Foster. I have not been forced to make this statement and I know that it will be used against me. I also have not been promised anything.'
 
 
 14
 4. The appellant Mason went voluntarily to the precinct station early in the evening of May 7, 1962, said he understood the police were looking for him concerning a rape on May 4, and admitted he had attempted to rape the victim but, before penetration, had either been pulled to his feet by one of the others or changed his mind. Thereupon the police officers placed him under arrest. Although Diane identified him as one of the rapists, at trial he denied the act and the jury found him guilty only of assault with intent to commit rape.
 
 
 15
 On appeal Oliver, Williams and Mason contend that the confession of codefendant Crump should not have been admitted into evidence without prior deletion of all reference to them. Appellant Crump's purported confession, allegedly written in his own hand, was correctly received against him,[3] but before it was admitted into evidence Oliver's counsel, on behalf of the three other appellants, made a general objection to its admission 'insofar as it reflects anything other than what this individual (Crump) himself has done.' The District Judge announced that he would give a limiting instruction and did so in terms, 'You should disregard any references in the statement to any other than the defendant Crump.' The statement was then read in full to the jury over defense objection that those portions of the confession relating to appellants Oliver, Williams and Mason should not be read to the jury.[4] Counsel did not make specific request or suggestion that those names be masked over under the rule laid down in Kramer v. United States, 115 U.S.App.D.C. 50, 317 F.2d 114 1963).
 
 
 16
 The matter of trying four defendants with separate counsel gives rise to numerous and vexing problems for the trial judge, and he is not aided when counsel make only a general objection when a specific course of action is required. Nevertheless, we believe that appellants have voiced timely objection sufficiently definite to preserve their contention for appeal. The question presented therefore is whether in the trial of a capital case, when deletion of reference to co-defendants is entirely feasible, the damaging impact of such reference can be repaired by a limiting instruction so that it can fairly be said that failure to delete the hearsay references did not affect substantial rights and was thus 'harmless error' under FED.R.CRIM.P. 52(a).[5]
 
 
 17
 The Supreme Court has quite clearly established the standard for determining on appeal whether a trial error should be held to have affected substantial rights:
 
 
 18
 'If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. * * * But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'
 
 
 19
 Kotteakos v. United States, 328 U.S. 750, 764-765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).[6] Here we cannot be 'sure' with that degree of conviction that the hearsay references to the other appellants by Crump's written confession did not sway the jury's judgment on the guilt of Oliver, Williams and Mason. The Government's evidence was indeed substantial; however, all appellants took the stand to deny their complicity and their alleged oral admissions to the police. I can see no basis for doubt that the writing attributed to Crump would have a tendency to influence the judgment of those jurors, if any, left in doubt as to whether to accept or to reject the stories of Oliver, Williams and Mason. This conclusion is buttessed by the fact that Crump's supposed confession allegedly being written in Crump's hand, rather than typed, although denied by him, probably added to its probative value and hence was potentially capable of greater prejudice to the other defendants. In this case, unlike the confession in Delli Paoli v. United States, 352 U.S. 232, 237, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), there was no 'impracticality of such deletion.' That the excision of some names would perhaps invite speculation by jurors is inherent; the objective should be to do the best that can be done to avoid risk of prejudice even though no steps can perfectly eliminate it.[7]
 
 
 20
 We find no error warranting reversal as to appellant Crump and judgment as to him is affirmed.
 
 
 21
 Reversed and remanded for a new trial as to appellants Oliver, Williams and Mason.
 
 
 22
 WILBUR K. MILLER, Circuit Judge (concurring in part and dissenting in part):
 
 
 23
 I join in the affirmance of Crump's conviction, but I dissent from and vigorously protest against the reversal of the convictions of Oliver, Williams and Mason. The latter three admitted their participation in this unusually vicious sexual assault upon a fourteen-year-old girl, and their guilt was amply proved otherwise.
 
 
 24
 It is to be presumed that the jury followed the court's instruction not to consider Crump's confession as evidence against the other three defendants. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294 (1957). Anyway, Crump's brief reference to them could not have been prejudicial, in my opinion, in view of the fact that their own confessions and other evidence overwhelmingly established their guilt. I would affirm all four convictions.
 
 
 25
 WRIGHT, Circuit Judge (concurring in part and dissenting in part):
 
 
 26
 A sordid case such as this subjects to severe test the safeguards with which the law surrounds the defendant in a criminal trial. But I would resist the temptation to relax these safeguards, particularly in inflammatory cases. For it is in just such cases that the need for a trial according to law is most compelling. A reprehensible crime understandably spurs the police and the prosecution toward retribution. But excessive zeal usually results, as here, in illegal investigative action compounded by gross procedural error. And such illegal action and gross procedural error can cause grave injustice. Where the appellants, all youths, have been given maximum sentences of 30 years and 15 years, a close look at the record is in order.
 
 
 27
 * The victim in this case, understandably, was not able to give the police much help in identifying her attackers. She did say that one of them had stated that 'Tuscon is my cousin.' Using this information as a clue, Detective Eger of the Sex Squad set out on the morning following the crime to find Tuscon. Detective Eger testified that he came upon a youth on the street in the general area where the crime was committed who looked 'a little puzzled.' He asked the youth if his name were Tuscon. According to Eger, the boy admitted he was Tuscon, but stated that his real name was James Oliver. Eger testified that he then remembered there was an outstanding arrest warrant for James Oliver in an unrelated case, and that he arrested Oliver on the basis of that warrant.
 
 
 28
 The Government relies solely on that alleged warrant in the unrelated case as the probable cause for the arrest of Oliver, in spite of the fact that in his brief assigned counsel for Oliver advised the Government and this court that he had made a search for this warrant and could find none. He further stated that he searched for a report of a preliminary hearing based on Oliver's arrest on the warrant and was able to find none. He further stated that the arrest book which was in court at the time of the trial showed that Oliver had been booked for rape, but that there was no booking whatever on the unrelated charge. At oral argument Government counsel, on being asked whether, in view of the allegations contained in Oliver's brief, any investigation had been made with respect to the existence of the warrant in the unrelated case and the booking thereon, advised the court that he knew of none.
 
 
 29
 It is now clear that the alleged warrant did not exist and Oliver's arrest was therefore made without probable cause. After oral argument a judicial request was made of the Government to produce the warrant, the arrest book which would show the arrest on the warrant, and the police record required to be kept by 4 D.C.Code 134a(a)(1) and (2), showing 'the circumstances under which the individual came into the custody of the police' and 'the charge originally placed against him.'[1] The United States Attorney, through the Chief of his Appellate Division, replied in writing: '* * * I have caused a thorough search to be made. It now appears that no such warrant or complaint was in existence, despite the detective's testimony that he knew such a warrant did exist.'[2] The United States Attorney's letter also advised that the record required to be kept by 4 D.C.Code 134a(a)(1) and (2) was 'a confidential record not available for public inspection,'[3] and suggested that we 'direct (our) request for the offense report to the Chief of Police.' This 'confidential' record, of course, would show 'the circumstances under which (Oliver) came into the custody of the police' and 'the charge originally placed against him' as required by 4 D.C.Code Code 134a(a)(1) and (2).
 
 II
 
 30
 Detective Eger testified that shortly after Oliver's arrival at the police station following his arrest, he admitted his complicity in the assault on Diane Wright. Since there was no probable cause[4] for Oliver's arrest, this oral confession, obtained during a period of illegal detention, was inadmissible. Wong Sun v. United States, 371 U.S. 471, 484-487, 83 S.Ct. 407 (1963); Gatlin v. United States, 117 U.S.App.D.C. , , 326 F.2d 666, 672 (1963). The Government argues that, in any event, Oliver did not allege the non-existence of the warrant at trial, and so cannot raise that issue on appeal, no matter what the official records show the facts to be. But trial counsel did specifically object to the admission of the oral confession on the ground of illegal arrest. To demand any more specific a challenge would be a rather unusual argument, since it assumes that Oliver's trial counsel should have known, or at least suspected, that Detective Eger may possibly have been perjuring himself when he testified that he arrested Oliver on the non-existent warrant. Moreover, a charge of perjury by a policy officer renders a conviction subject to collateral attack. Curran v. State of Delaware, 3 Cir., 259 F.2d 707, 713 (1958). Here, where the question is raised on direct appeal, reversal is in order.
 
 III
 
 31
 There is another reason why Oliver's conviction must be reversed. Appellant Crump, according to police, signed a written confession in which he named Oliver and the other appellants as persons who had assaulted Diane Wright on the evening in question. In spite of defense counsel's objections and suggestions, this confession was admitted into evidence without deleting the names of, and the accusations against, Crump's co-defendants. The Government in its brief admits that the objectionable portion of Crump's confession 'could easily have been masked over.'[5] Under the circumstances, the objectionable portion should have been withheld from the jury. See Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294 (1957).[6] Unnecessarily giving the jury these hearsay accusations against co-defendants is reversible error. Kramer v. United States, 115 U.S.App.D.C. 50, 52-53, 317 F.2d 114, 116-117 (1963).[7] No instruction could have cured the prejudice to the co-defendants concerned. Ibid. 'The naive assumption that prejudicial effects can be overcome by instructions to the jury, cf. Blumenthal v. United States, 332 U.S. 539, 559 (68 S.Ct. 248, 257, 92 L.Ed. 154), all practicing lawyers know to be unmitigated fiction.'.[8]
 
 
 32
 The Government argues that the admission of this inadmissible hearsay evidence was harmless since the other evidence did not leave the issue of Oliver's guilt in doubt. But 'We are not concerned here with whether there was sufficient evidence on which the (appellant) could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230 (1963); cf. Stoner v. California, 376 U.S. 483, 490, n. 8, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). As the court's opinion indicates, that reasonable possibility exists.[9]
 
 IV
 
 33
 According to the police, after his arrest Oliver not only admitted his part in the crime, but involved appellants Williams and Crump as well. Acting on this information alone, the police arrested Williams and Crump, obtained confessions from them, and later charged them with rape. Over objection, the police were allowed to testify as to these confessions. This was reversible error. There was no probable cause shown for the arrest of Williams or Crump and the confessions obtained from them during a period of unlawful detention are inadmissible in evidence. As Wong Sun and Gatlin make clear, accusations of complicity obtained from a suspect do not provide probable cause for arrest. Such information is the beginning, not the end, of police investigation. There is no suggestion that Oliver was a reliable informant or that he was even known to the police in any capacity-- except, of course, as the named defendant in the non-existent warrant. He was simply a suspect accused of crime accusing others. Such unsupported information forms no basis for a lawful arrest. Wong Sun v. United States, supra, 371 U.S. at 479-484, 491, 83 S.Ct. 407; Gatlin v. United States, supra, 117 U.S.App.D.C. at , 326 F.2d at 671.[10]
 
 
 34
 In view of the circumstances surrounding the investigation and prosecution of these cases, a thought recently expressed by Mr. Justice Stewart in his opinion for the Court in Elkins v. United States, 364 U.S. 206, 222-223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960), bears repetition:
 
 
 35
 '* * * But there is another consideration-- the imperative of judicial integrity. It was of this that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in Olmstead v. United States, 277 U.S. 438, at 469, 171 (48 S.Ct. 564, at pages 569, 570, 72 L.Ed. 944), more than 30 years ago. 'For those who agree with me,' said Mr. Justice Holmes, 'no distinction can be taken between the Government as prosecutor and the Government as judge.' 277 U.S. at 470 (48 S.Ct., at page 575). (Dissenting opinion.) 'In a government of laws,' said Mr. Justice Brandeis, 'existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means-- to declare that the Government may commit crimes in order to secure the conviction of a private criminal-- would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.' 277 U.S., at 485 (48 S.Ct. at 575). * * *'
 
 
 36
 I respectfully dissent from that part of the court's decision which affirms the conviction of Crump. Otherwise I concur for the reasons stated in this opinion.
 
 
 
 [1]
 There was no motion for severance
 
 
 [2]
 Oliver was arrested by the Detective as soon as he identified himself as 'James Oliver'; the officer said he had personal knowledge of an outstanding warrant for Oliver's arrest on an assault charge. At trial defense counsel objected to references to this warrant but did not ask that it be produced or otherwise challenge the existence or validity of the assault warrant on which Oliver was picked up. However, in the course of our consideration of this appeal, the Government informed this court that no record of a warrant for Oliver's arrest could be found and that it must be assumed at this stage that no such warrant existed. The effect of this on the apprehension of Oliver and in turn the impact of this on the admissibility of Oliver's confession have not been considered by the District Court and are therefore not ripe for appellate appraisal. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). It is inappropriate for us to undertake an advisory opinion on issues which may or may not arise
 
 
 [3]
 Crump made his statement at the threshold and spontaneously saying, according to police testimony, 'I want to get this off my chest. I would like to tell everything.' See United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944). Crump denied making any admissions to the police or writing the confession attributed to him
 
 
 [4]
 After the police officer had read to the jury the beginning of Crump's alleged confession ('I Robert Crump was with Tooson, Larry, George, Pete, Clarence Baker, Skip-- '), the following colloquy occurred between defense counsel and the trial judge:
 'Your Honor, I object to what he has just stated. Your Honor has instructed him and he has proceeded to read this, disregarding his Honor's instructions. (In fact, the trial judge had never so instructed.)
 'THE COURT: The entire statement must be read to the jury. I have told the jury that it is applicable only as to the declarant. Go ahead.'
 
 
 [5]
 FED.R.CRIM.P. 52(a) states:
 'Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.'
 
 
 [6]
 And see Fahy v. Connecticut, 375 U.S. 85, 91-92, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)
 
 
 [7]
 We note here that the few sentences relating to the other appellants could quite readily have been deleted from the relatively short statement without impairing the effectiveness of the confession as to Crump
 
 
 [1]
 We may, of course, take judicial notice of official records of judicial action within the supervisory jurisdiction of this court. Cf. Oughton v. United States, 9 Cir., 215 F.2d 578 (1954); Lopez v. Swope, 9 Cir., 205 F.2d 8 (1953). See also Rule 5(c), F.R.Cr.P
 
 
 [2]
 The letter, addressed to the Clerk of this court, follows:
 'Reference is made to your letter of February 18, 1964, in which you stated that a judge of the Court has directed you to make certain requests of me in regard to the captioned cases. The delay in answering this letter has been occasioned by the necessity to make a thorough investigation regarding the items requested.
 'With respect to the request for photostatic copies of the complaint and warrant for assault on the basis of which Oliver was arrested by Detective Eger, I have caused a thorough search to be made. It now appears that no such warrant or complaint was in existence, despite the detective's testimony that he knew such a warrant did exist. As you are undoubtedly aware, the fact of the non-existence of the complaint and assault warrant and the facts explaining why Detective Eger testified that he knew of such a warrant are not before the Court or in the record on appeal. * * *
 'In view of the non-existence of the assault warrant it is impossible to comply with the additional request of the judge that you be furnished with copies of the official records of the arrest under the assault warrant. * * *
 * * * *'of
 'The arrest book is an extremely large volume weighing approximately 35 pounds. Should the judge desire to see the book it is located at the 14th Precinct Station, 4135 Benning Road, N.E.
 'The offense report made pursuant to 4 D.C.Code 4-134(a)(1) and (2) is in the custody of the Central Criminal Records Division of the Metropolitan Police Department and is maintained as a confidential record not available for public inspection. While I have no doubt that such a record would be available to my office during the course of an investigation, I feel sure that this would be so by reason of a confidential relationship arising from such joint investigation, rather than because of the position of this office as advocate in a case before the court. In this situation, I feel that we occupy rather a dual position opposite the Police Department, and I would feel some embarrassment in drawing upon a confidential relationship with that department to obtain materials for a purpose which is not a part of that relationship, but rather for a purpose incident to a court litigation. While we are no doubt answerable to the courts, I would doubt that that accountability runs to our more confidential dealings with the Police Department and communications between the two offices in the course of investigative or preparatory work. You know, of course, that we have no administrative responsibility for the Police Department, which is not organized within the Department of Justice, nor we within the District of Columbia Government. Accordingly, it would relieve us of a possible embarrassment if you would be good enough to direct your request for the offense report to the Chief of Police.
 * * * *'ed
 
 
 [3]
 I note that at trial the defense counsel requested various reports filed by the arresting officer and the Central Criminal Records book for this case. The information requested was turned over to him and used by him in examining the arresting officer
 
 
 [4]
 The Government, for obvious reasons, does not rely on the following testimony of the arresting officer as indicating probable cause:
 DEFENSE COUNSEL: 'Tuscon is my cousin is what someone said, and based upon this information you arrested a man named Oliver? Is this correct?
 ARRESTING OFFICER: 'Yes.
 DEFENSE COUNSEL: 'And am I correct in understanding that you identified Oliver as Tuscon, not Tuscon's cousin?
 ARRESTING OFFICER: 'Yes, sir.'
 This sort of arrest, solely for investigation, has long stood condemned as a flagrant violation of the Fourth Amendment. Wrightson v. United States, 95 U.S.App.D.C. 390, 222 F.2d 556 (1955).
 
 
 [5]
 This concession by the Government relieves an embarrassing situation. In the letter of the United States Attorney to the Clerk of this court the following appears:
 'With regard to the request that you be furnished Government's Exhibit No. 6, a statement of Robert A. Crump, an exhaustive search has failed to locate this exhibit. The record on appeal does reflect that the attorney from the Department of Justice who tried this case signed a receipt for the exhibit. He is no longer employed in the Government. However, he was contacted by telephone and has stated that he has no recollection of receiving or surrendering the exhibit. The files of the United States Attorney's Office do not contain the exhibit nor do the files of the Metropolitan Police Department. Inquiry has been made of the police officers involved in the case and they are unable to account for the exhibit. A search has also been made in the Clerk's Office of the District Court. Mr. Pilzer advises that he does not possess this exhibit. I regret the inability to supply the exhibit. Its contents are of record, however, See: Tr. 168-169.'
 Under Rule 12(a) of this court, the original exhibit which constitutes Crump's confession should be part of the record on appeal.
 
 
 [6]
 In Delli Paoli, with reference to a somewhat similar situation, the Court said, 'Similarly, if the trial court had deleted from the confession all references to petitioner's connection with the conspiracy, the admission of the remainder would not have been objectionable. The impracticality of such deletion was, however, agreed to by both the trial court and the entire court below and cannot well be controverted.' 352 U.S. at 237, 77 S.Ct. at 297. In this case, where the objectionable hearsay accusations are contained in two sentences easily deleted from the confession, failure to delete renders the admission objectionable
 
 
 [7]
 In Kramer, an instruction was given and there was no request for omission of codefendants' names, 115 U.S.App.D.C. at 52-53, 317 F.2d at 116-117, and even apart from the incriminating reference there was adequate evidence on which to convict, 115 U.S.App.D.C. at 51, 317 F.2d at 115. Nevertheless, this court reversed for failure to omit co-defendants' names from a confession, holding:
 'The better rule is that when deletion of the hearsay reference to a codefendant is feasible, as it was in our case, an instruction by the court that the jury disregard the reference is not an adequate substitute for deletion * * * (Citing cases.)'
 115 U.S.App.D.C. at 53, 317 F.2d at 117.
 In this case, there was a request that co-defendants' names be deleted, see Tr. pp. 166, 168, and without the confessions the evidentiary question for the jury would have been a close one. Compare Franklin v. United States, 117 U.S.App.D.C. , 330 F.2d 205 (1964). Thus there are no valid grounds for distinguishing the Kramer holding. Quite the contrary, the case for reversal here is stronger than in Kramer.
 The test of the Kramer doctrine is whether the material sought to be omitted can be removed without destroying the substance of the confession. The incriminating hearsay reference must be removed whenever it is 'feasible,' 115 U.S.App.D.C. at 53, 317 F.2d at 117, where the reference is 'no essential part,' 115 U.S.App.D.C. at 52, 317 F.2d at 116, of the confession, where it is 'in no manner inseparably intertwined,' ibid., or where there is no 'impracticality of deletion.' 115 U.S.App.D.C. at 53, 317 F.2d at 117. 'The trial judge in our case as well as the prosecuting attorney could have taken steps to protect the trial from this inadmissible hearsay evidence.' Ibid. 'Our decision turns on the admission itself of the hearsay evidence at the instance of the prosecution in circumstances which would readily have permitted the court to avoid injection of this evidence into the trial.' Ibid.
 
 
 [8]
 Mr. Justice Jackson, writing also for Mr. Justice Frankfurter and Mr. Justice Murphy, concurring, in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949), quoted by this court in Kramer v. United States, supra, 115 U.S.App.D.C. at 53, n. 3, 317 F.2d at 117, n. 3
 
 
 [9]
 The convictions of Williams and Mason are properly reversed because they too were named, with Oliver, in the written confession of Crump as confederates in the crime. Kramer v. United States, supra, 115 U.S.App.D.C. at 52-53, 317 F.2d at 116-117
 
 
 [10]
 The Wong Sun 'approver' rule, that an arrested suspect's accusation is not per se reliable, was followed by this court in Gatlin v. United States, supra, 117 U.S.App.D.C. at , 326 F.2d at 671: 'Miller's arrest was likewise without probable cause, being based solely on information obtained from an accomplice whose reliability is neither alleged nor established.' See also Wong Sun v. United States, 9 Cir., 288 F.2d 366, 370 (1961): 'As this court said in Rodgers v. United States, supra (267 F.2d 79, 85), '* * * where the officer makes an arrest without any knowledge of the commission of a crime except from an informer whom he does not know to be reliable, the courts have consistently held there is no reasonable grounds for the arrest." Approved as to this point, 371 U.S. at 479-484, 491, 83 S.Ct. at 419