416 F.2d 545
 Billy Wayne POSEY, Cecil Ray Price, Horace Doyle Barnette,
Jimmy Snowden, Jimmy Arledge, Alton Wayne Roberts
and Sam Holloway Bowers, Jr., Appellants,
v.
UNITED STATES of America, Appellee.
 No. 25654.
 United States Court of Appeals Fifth Circuit.
 July 17, 1969, Rehearing Denied and Rehearing En Banc Denied
Aug. 28, 1969.
 
 1
 Laurel G. Weir, Herman Alfrod, W. Montgomery Mars, Clayton Lewis, Philadelphia, Miss., Dennis Goldman, H. C. Watkins, Billy R. Covington, Meridian, Miss., Travis Buckley, Bay Springs, Miss., for appellants.
 
 
 2
 Robert E. Hauberg, U.S. Atty., Jackson, Miss., D. Robert Owen, Atty., Dept. of Justice, Washington, D.C., Jerris Leonard, Asst. Atty. Gen., Merle W. Loper, Atty., Dep. of Justice, Washington, D.C., for appellee.
 
 
 3
 Before BELL and SIMPSON, Circuit Judges, and MEHRTENS, District Judge.
 
 MEHRTENS, District Judge:
 
 4
 After a trial on an indictment charging eighteen persons with violating 18 U.S.C. 241 by conspiring to injure, threaten, oppress and intimidate Michael Schwerner, James Earl Chaney and Andrew Goodman in the free exercise of their Constitutional rights not to be deprived of life or liberty without due process of law, the jury found seven of the defendants guilty and eight not guilty. There was a mistrial as to the other three. Motions for a new trial were denied and the convicted defendants appealed. We affirm.
 
 
 5
 Appellants assert that numerous errors were committed in the trial. These contentions will be treated seriatim, but it will first be necessary to set forth some of the facts giving rise to this prosecution in order to place appellants' objections in their proper context. Additional facts will be added where necessary in treating the various points.
 
 
 6
 The evidence adduced at trial reveals that civil rights activity in the Meridian, Mississippi area began early in 1964. About the same time the White Knights of the Ku Klux Klan, a militant white organization supporting racial segregation and advocating destruction of its enemies, formed a Klavern in Meridian. Appellant Bowers, as 'Imperial Wizard,' was head of the state Klan organization. Among those who joined the Meridian Klavern were appellants Roberts, Snowden, Arledge and Barnette. Appellants Price and Posey were members of a Philadelphia Klavern.
 
 
 7
 Because of his civil rights activity Schwerner was well known to and hated by the Klan and his 'elimination' had been discussed at several meetings. At one meeting the members were advised that his elimination had been approved by Bowers, the Imperial Wizard.
 
 
 8
 Schwerner, a native of New York, had been active in civil rights in Meridian, Mississippi for about two months prior to the incident which gave rise to the prosecution in question. Chaney had also participated in civil rights work in the same locale. Goodman had arrived in Mississippi only a day or two earlier.
 
 
 9
 The three had driven to the Mt. Zion Church area, ten miles east of Philadelphia, to investigate the burning of a Negro church. They were riding in a station wagon owned by the Congress of Racial Equality.
 
 
 10
 After investigating the church-burning the three then began driving toward Philadelphia. As they were fixing a flat tire on the way, Deputy Sheriff Cecil Price arrested Chaney for speeding and held the others 'for investigation.' The three were taken to the county jail at about 4:00 P.M. and were released by Price at 10:30 that night.
 
 
 11
 While the civil rights workers were in jail Klan members, including James Jordan (a government witness), Roberts, Barnette, Snowden and Arledge, were assembled to drive to Philadelphia and wait for the three civil rights workers' release from jail. Upon arrival they met Price and Posey and began following Price at a high speed, looking for the three civil rights workers. Eventually Price overtook the station wagon and stopped it. He put the three civil rights workers in his car.
 
 
 12
 With Schwerner, Goodman and Chaney in Price's car, the caravan proceeded south for a few miles. Jordan was let out of one of the cars to act as lookout. He thereafter heard several pistol shots fired and saw the three civil rights workers lying on the ground. Present at the time were Price, Barnette, Posey, Arledge, Roberts and Snowden.
 
 
 13
 The bodies were placed in one of the cars and taken to a dam site where, with the aid of a bulldozer, they were buried. Subsequently the Klan members reassembled in Philadelphia and then dispersed. Two days later the station wagon in which the three civil rights workers had been traveling was found completely burned out. Their bodies were found six weeks later. Each had died of gunshot wounds.
 
 
 14
 * THE MIRANDA PROBLEM
 
 
 15
 Appellant Barnette asserts that his written confession was involuntary and made without the warning required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that he had a right to remain silent. We disagree.
 
 
 16
 Under Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Miranda test must be applied to this statement taken in 1964 because the case was tried after June 13, 1966, the date Miranda was decided.
 
 
 17
 After a full scale Miranda hearing, in camera, it was clearly established without contradiction that Barnette, who lived and worked in Cullen, Louisiana, met with two FBI agents in the motel room where they were staying. At the first meeting he was warned that he did not have to make a statement; that any statement made by him could be used against him in court and that if he was brought before a court and needed an attorney but could not afford one, an attorney would be provided for him.[1] Only general Klan activities in Meridian were discussed. No mention was made of the slaying and no statement was made. After two hours Barnette left, stating that he had to drive that night for the trucking company he worked for. He agreed that he would meet the agents the next day. The following day, after first communicating with the agents, he drove his car to the motel to see them. He was again advised that he did not have to talk to the agents; that he had the right to consult an attorney before he talked to them and that any statement made by him could be used in court against him. He thereafter gave the statement relating his part in and the events surrounding the slaying of the three civil rights workers. Barnette at all times during the interview was free to leave any time he wanted to do so. He was never in custody. No force, coercion or restraint of any nature was used and no threats or promises made. He voluntarily waited, of his own accord, until the statement was completed, then he read it, made corrections, wrote a paragraph on the back and then signed it. There was a total absence of restraint, and Barnette had the liberty to leave whenever he wished to go. Thereafter he actually did leave. The statement states that he was again given these warnings. He terminated the first meeting and left freely; he freely returned the next day, drove home after giving the statement, and freely and voluntarily returned the next day to look at pictures and to bring the rifle mentioned in his statement.
 
 
 18
 The trial judge, upon these facts, found that Barnette knowingly, understandingly and intelligently told the agents 'exactly what he knew and intended to tell them and that the statement was free and voluntary.' The court thereafter instructed the jury that they should not consider the confession unless convinced beyond all reasonable doubt that it was made voluntarily and understandingly.
 
 
 19
 Miranda warnings apply to 'custodial interrogation' defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way,' 384 U.S. at 444, 86 S.Ct. at 1612.
 
 
 20
 In common with many other circuits, we have held that non-custodial interrogation and statements stemming therefrom do not require Miranda warnings.[2]
 
 
 21
 Nothing in this record indicates that Barnette was in custody or otherwise deprived of his freedom of action in any significant way. There is no evidence whatsoever of the use of force, coercion or intimidation, physical or psychological, actual or implied. The evidence clearly shows that the only reason for his confession was that 'it had been bothering him, and he wanted to get it off his mind.' The Constitutional rights of Barnette did not require the agents to seal his lips or gag him in order to prevent him from making the statement.
 
 
 22
 We conclude that Barnette was not in custody nor was he deprived of his freedom of action in any significant way, that he gave the confession freely and voluntarily and that therefore the application of Miranda was not required. The district court did not err in overruling his objections.
 
 II-III
 THE BRUTON PROBLEM
 
 23
 All appellants, except Barnette, contend that admitting Barnette's confession violated their right of confrontation secured by the Sixth Amendment. They rely primarily upon Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), wherein a witness testified that one defendant had confessed that he and Bruton, the other defendant, committed an armed robbery. Bruton's co-defendant, protected by the Fifth Amendment, did not take the stand and could not be cross-examined respecting his extrajudicial statement implicating Bruton. The Court held that statements made without opportunity for cross-examination are admissible only against the person who made them and that instructions to the jury not to use the statements of one defendant against another are not an adequate substitute for a defendant's right of cross-examination.
 
 
 24
 After ruling that the confession was admissible against Barnette, the district court directed counsel for the government and the defendants to eliminate all references to the co-defendants. Counsel for all parties then joined in deleting the names of all co-defendants except Jordan's whose name remained in the statement at the insistence of defense counsel. All items which might tend to identify any other co-defendant were deleted, including locations that might tend to identify any co-defendant and descriptions of automobiles. Single words, phrases, lines and whole sentences were deleted when necessary to protect the co-defendants. There were over 100 deletions, including at least thirteen complete sentences. No objections were made to the court's failure to require deletion of any specific additional words and no claim was made that any specific portion of the statement, as admitted, tended to identify any co-defendant. The statement was read to the jury after four days of testimony by the government, after both the court and counsel stated that it was to be considered only against Barnette. Four days later the statement was again read to the jury, during argument, and the court again instructed the jury that it was to be considered only against Barnette. The jury never saw the statement and were not permitted to take it into the jury room. Without showing a single example of how any part of the statement implicated them and without suggesting how any juror could determine which name, if any, of the seventeen co-defendants could be substituted for any of the eighty-two times the word 'blank' was read, the codefendants claim that Jordan's testimony (a former Klan member who testified for the government) placed their names back into the 'blanks.'
 
 
 25
 In the context of the trial the deletions effectively protected the co-defendants. After nearly two days of deliberation the jury found seven defendants (appellants here) guilty and eight defendants not guilty; and on three it could not agree. Both reason and the selective verdict compel the conclusion that the jurors did not consider Barnette's statements against any of the co-defendants, either the six they convicted, the eight they acquitted, or the three they were unable to agree upon. The evidence supplied through the statement did not give substantial or critical support to the government's case as to the co-defendants in a form not subject to cross-examination, nor were appellants the victims of 'powerfully incriminating extrajudicial statements of a co-defendant' as was Bruton.
 
 
 26
 This court, as well as others, has held that there is no error in the admission of a co-defendant's confession, if all references to the other defendants are deleted and there is no 'substantial threat' to the right of confrontation and cross-examination. Menendez v. United States, 393 F.2d 312 (5 Cir. 1968); Barton v. United States, 263 F.2d 894 (5 Cir. 1959); Calloway v. United States, 399 F.2d 1006 (2 Cir. 1968); Oliver v. United States, 118 U.S.App.D.C. 302, 335 F.2d 724 (1964); Kramer v. United States, 115 U.S.App.D.C. 50, 317 F.2d 114 (1963). This case is clearly distinguishable from those relied upon by appellants. Jordan's testimony did not make it inferable that the blanks pertained to any of his co-defendants. The fact that the jury convicted only seven out of the eighteen defendants makes it most unlikely that the jury could or did infer that the anonymous references were to any specific defendant.
 
 
 27
 Even had we held that the admission of the confession was error as to the co-defendants, the evidence supplied by the confession was merely cumulative and, apart from it, the case against the co-defendants was so overwhelming that we conclude that any possible violation of Bruton was harmless beyond a reasonable doubt. See Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, decided June 2, 1969.
 
 
 28
 Failing to bring themselves within the ambit of the Bruton decision, the appellants' Constitutional rights were not infringed by either the admission of Barnette's confession or their joint trial.
 
 
 29
 Appellants' motion for a severance is based largely upon the admission of Barnette's statement and the likelihood of substantial prejudice to them from being tried with Barnette. The granting or denying of such a motion is a matter within the sound discretion of the trial judge. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Rule 14, Federal Rules of Criminal Procedure. We have consistently adhered to such rule. Barnes v. United States, 374 F.2d 126 (5 Cir. 1967), cert. den.389 U.S. 917, 88 S.Ct. 246, 19 L.Ed.2d 273. The court's ruling will not be disturbed unless there is a positive showing of abuse of discretion resulting in prejudice to the movant. Blachly v. United States, 380 F.2d 665, 674 (5 Cir. 1967). Having held that the admission of the confession was not error, we likewise hold that there was no abuse of discretion in denying the motions to sever.
 
 IV
 THE 'ALLEN' CHARGE
 
 30
 Next we consider the criticism by all appellants, except Barnette, of the use by the trial court of a charge after nine hours and forty minutes of deliberation, patterned after the charge in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Unlike other 'Allen' charges, even those which have received approval, each juror was further instructed that he was not to surrender his conscientious convictions for the mere purpose of returning a verdict; that no juror was expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence; that it was the jury's duty to agree upon a verdict only if each juror could do so without violating his individual judgment and conscience; and that the parties were entitled to a mistrial if the jury could not agree on a verdict but that the jury had no duty absolute to agree on any verdict.
 
 
 31
 This type of charge was first approved by the Supreme Court in Allen v. United States, supra. This court, although sometimes reluctantly[3] has approved the use of the 'Allen' charge after assuring itself that no partial or one-sided comments were engrafted upon it.[4]
 
 
 32
 The charge given here by the trial court contained none of the objectionable language appearing in Powell v. United States, 297 F.2d 318 (5 Cir. 1961); in Huffman v. United States, supra; or in Green v. United States, 309 F.2d 852 (5 Cir. 1962). Nor was it one-sided as in United States v. Rogers, 289 F.2d 433 (4 Cir. 1961). The decision to give the charge lies largely within the discretion of the trial judge. Silverman v. Travelers Insurance Company, 277 F.2d 257 (5 Cir. 1960). The 'Allen' charge is permissible in this circuit, under proper circumstances as long as it makes clear to the jury that each member has a duty conscientiously to adhere to his own honest opinion and it avoids creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to create a mistrial.
 
 
 33
 In this case there was no abuse of discretion in giving the charge and the language does not go beyond the bounds of the permissible scope of such a charge. It did not invade the province of the jury, nor did it deprive the defendants of any right to a fair and just trial.
 
 V
 MISSTATEMENT IN GOVERNMENT'S SUMMATION
 
 34
 During closing argument government's counsel misstated the name of 'Price' in place of 'Jordan' during a hurried reading of Barnette's statement. The statement read: 'Jordan asked him who was going to stop them and (blank) said that he would.' Government counsel erroneously read: 'Price asked him who was going to stop them and (blank) said that he would.' Defense counsel objected: 'Your Honor, please, just a minute. He's quoting names in this statement and we object to it. It's not there.' By Mr. Weir: 'Move the Court for a mistrial.' By the Court: Overruled, gentlemen, go along.' Appellants Price, Posey and Bowers claim their rights to a fair trial were prejudiced. The naming of Price could not, of course, prejudice anyone but Price.
 
 
 35
 No specific objection was made or any specified assistance requested from the Court as required by Rule 51, Federal Rules of Criminal Procedure. It would have been proper for government counsel to have called the name of Jordan instead of Price and counsel merely objected that government counsel was 'quoting names.' Defense counsel did not request the court to make any correction in the misstatement, or to have counsel re-read the sentence correctly; nor did he request the court to make any kind of correcting statement to the jury about the incident.
 
 
 36
 No more mention was made of the incident until Motions for a New Trial were filed. In denying the motions the district court found that the naming of Price under such circumstances was an innocuous incident, that the misreading was unintentional, that the incident added nothing to the government's proof of Price's guilt and that his guilt was abundantly proved by eye witnesses' testimony.
 
 
 37
 Great weight must be given to the findings of the trial judge who saw and heard the actual events and found no prejudice. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Harrison v. United States, 191 F.2d 874 (5 Cir. 1951); Orebo v. United States, 293 F.2d 747 (9 Cir. 1961); United States v. Holt, 108 F.2d 365 (7 Cir. 1939); and Tuckerman v. United States, 291 F. 958 (6 Cir. 1923).
 
 
 38
 This is not a case of prosecutorial overkill in argument by striking foul blows or using improper methods calculated to produce a wrongful conviction.
 
 
 39
 Furthermore, the evidence as to Price's guilt is not so tenuous and indecisive that an incident of this nature assumes great importance. Handford v. United States, 249 F.2d 295 (5 Cir. 1957); Johnson v. United States,356 F.2d 680 (8 Cir. 1966), cert. den., 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84. On the contrary, the direct and circumstantial evidence of Price's guilt is overwhelming. It is inconceivable how this one misstatement could possibly have influenced the jury to reach an improper verdict. Even had the district court's ruling been error, which it was not, the error would have been harmless under Rule 52(a), Federal Rules of Criminal Procedure. We find that Price's right to a fair trial was not affected by the misstatement.
 
 VI
 POLL OF THE JURY
 
 40
 Appellants Price, Posey and Bowers next assert that the trial court erred in denying their request to poll the jury after the verdict was returned. We find their claim to be without substance. The verdict was on a form prepared by the court with a line for the signature of each juror rather than just the Foreman. Each of the jurors signed the verdict.
 
 
 41
 The record reflects that after the Clerk read the separate verdicts, the Foreman would answer 'That is correct.' 'By the Clerk: So say ye all? (Jurors polled).' After the last verdict was read the Clerk asked, 'Is this your unanimous verdict Jurors as to guilty or not guilty of the defendants? JURORS ANSWER YES.' The Clerk: 'So say ye all? (Jurors polled).' At the conclusion of this procedure counsel requested that the jury be polled and the district court replied: 'Well the jurors have been polled. That was what she was doing when she asked them and they've answered you. Do you want to ask them again?' To which counsel replied: 'Yes sir.' Whereupon the Court denied the motion to poll the jury again.
 
 
 42
 In denying the motions for a new trial the district court made findings, which are not controverted, amplifying the record as follows: 'All twelve jurors signed the verdict on the twelve lines prepared for their signatures. As the verdict as to each defendant was read, the Clerk asked the jury collectively as to whether or not that was the unanimous verdict with respect to that defendant as to guilt or innocence (and that they were unable to agree on a verdict as to the three defendants) and the jurors each said that it was, then the Clerk likewise asked them: 'So say you all,' and the jury again nodded approval and gave their express assent and approval to each verdict. That course was followed as to each defendant separately. At the conclusion of such procedure, the defendants requested that the jury be again polled under Criminal Rule 31(d) and that request was denied. Clearly, the jury was polled at the instance of the court and they were specifically and personally interrogated by the Clerk as to the genuineness of such verdict bearing their signatures, and they severally assented thereto and readopted their decision in each instance as to each defendant as stated. Surely, any one of these jurors had the right even in the jury box to renounce his or her decision in the jury room and to express a dissent which would have returned them to the jury room for further deliberations, but there was no dissent expressed. There is no merit in the contention that this jury was not polled, or that this verdict does not represent the true and lawful and genuine verdict of this entire jury as expressed by the verdict and as vocally expressed by the jury to the Clerk from the jury box in open court when the verdict was thereafter duly received, entered and filed by the Clerk as the verdict of this jury.'
 
 
 43
 The right to have the jury polled is established by Rule 31, Federal Rules of Criminal Procedure. The object of a jury poll is 'to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented.' Humphries v. District of Columbia, 174 U.S. 190, 19 S.Ct. 637, 43 L.Ed. 944 (1899); Miranda v. United States, 255 F.2d 9 (1 Cir. 1958). Here each of the jurors not only signed the verdict but also individually assented to and readopted his or her verdict as to each defendant. Each juror had the opportunity and right to renounce his or her decision in open court and express dissent from the returned verdict; but none did so. Clearly, from these proceedings, the jury was polled and the court and parties, from the individual expressions of concurrence from each juror, could and did ascertain with certainty that the verdict, as returned, was the present and unanimous verdict of the jury.
 
 VII
 DEFENDANTS' ABSENCE FROM COURTROOM
 
 44
 Appellants Price, Posey and Bowers next contend that the district court erred in refusing to permit the defendants to remain in the courthouse during jury deliberations.
 
 
 45
 The record indicates that the courthouse was emptied the last night of the jury's deliberations to permit the jury to walk in privacy from the jury room to have dinner at another location. The district court, in denying new trials, related the uncontroverted factual situation: 'The court facilities and accommodations at Meridian are not large. There were initially three hundred fifty jurors in attendance before the twelve member panel of jurors and their alternates were accepted. There were some sixty newspaper reporters in attendance, most of whom came from other states and as far away as London, England. There were some twenty-five or thirty cameras and newsreel operators in attendance who were not allowed by the court to cross the city sidewalk which surrounded the United States Court Building. These people had long ago worn out their welcome with the Court by making nuisances of themselves in persisting to repeatedly take closeup pictures of the defendants and the Court. This is a mere sketch of the circumstances and conditions existing during their trial. * * * On the evening in question, the marshals reported to the Court at the hotel that the jury wanted to go to dinner and resume deliberations thereafter. The marshals were instructed to clear the court building and take the jury to dinner out of the back door of the building to avoid photographs and to avoid passing through any group of interested spectators. The marshals handled this jury in every respect exactly as directed by the Court. The jury was not subjected to any outside influence from any source and were spared embarrassment and unnecessary publicity as they requested. The jury was not deliberating at any time after they requested to be carried to supper or dinner. That is when the building was emptied. The jury was returned to its room and began deliberations after the meal and these defendants and their attorneys and families and friends never had any vested right to remain in this building while security orders of the Court were being executed.'
 
 
 46
 Inasmuch as it clearly appears that no deliberations were being held at the time defendants were absent from the courthouse it is unnecessary to determine whether or not the appellants were denied any claimed rights.
 
 VIII
 COURT'S COMMENTS TO COUNSEL
 
 47
 Appellants Price and Posey contend that during the trial, in the presence of the jury, the court made derogatory comments about their counsel, harassing and mistreating them, thereby prejudicing these appellants.
 
 
 48
 The conduct of the trial judge must be measured by a standard of fairness and impartiality. He is not, however, a mere moderator. It is his duty to conduct an orderly trial and to make certain, as far as possible, that there is no misunderstanding of the testimony.[5] The comments of the court were often necessary to keep the trial on the proper footing, to expedite the trial, to avoid repetition in testimony and to properly restrict examination of witnesses by multiple counsel. Considering the conduct of the trial in its entirety, we conclude that the trial judge did not commit error.
 
 IX
 FAILURE TO GIVE REQUESTED INSTRUCTIONS
 
 49
 We cannot accept the argument that the trial judge erred in failing to give the instructions requested by appellants Price, Posey and Bowers. The trial court need not charge the jury in the exact words requested by the defendants but is free to use language of its own choice where the general charge adequately covers the issues. The court gave a full, careful, complete and accurate charge thirty-three pages long, which adequately covered the points of law in and the substance of all of the requested instructions. Lambert v. United States, 261 F.2d 799 (5 Cir. 1958); Cain v. United States, 274 F.2d 598 (5 Cir. 1960); Windisch v. United States, 295 F.2d 531 (5 Cir. 1961); Sachs v. United States, 293 F.2d 623 (5 Cir. 1961), cert. den., 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338.
 
 X
 SUFFICIENCY OF EVIDENCE
 
 50
 The complaint of appellants Bowers, Price and Posey that the evidence is insufficient to support a conviction and that the district court erred in denying the motions for judgment of acquittal is not persuasive. We view the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Peters v. United States, 376 F.2d 839 (5 Cir. 1967); Thurmond v. United States, 377 F.2d 448 (5 Cir. 1967); United States v. Sutton, 5 Cir., 411 F.2d 405, decided May 12, 1969, and find that it constitutes a wholly substantial basis on which the jury could find appellants guilty beyond a reasonable doubt. There is ample-- in fact, overwhelming-- untainted evidence that the defendants conspired together to have Price, a deputy sheriff, arrest Schwerner, Chaney and Goodman, United States citizens; that Price would hold them in custody until such time that when released, Price, Arledge, Barnette, Roberts, Snowden, Jordan and Posey could and would intercept them, assault and kill them; and that each was present at and participated in the murder of the three men and the disposal of their bodies by burial fifteen feet beneath the top of an earthen dam deep in the woods.
 
 
 51
 As to Bowers, although not a participant in the slayings, the evidence showed that he was the state leader, the Imperial Wizard, of the White Knights, a self styled militant organization (to which the other appellants belonged), dedicated to the perpetuation of segregation and the destruction of its enemies; that he lectured 'we are disposed to the use of physical force against our enemies' and 'If our enemies can be driven out of the community by propaganda, well enough. If they continue to resist, they must be physically destroyed'; that specific procedures were established for approving various levels of violence with the most drastic being 'elimination' or death; and that Klan procedure required Bowers' personal approval for any 'elimination.' Without Klan approval there would be no financial support. Schwerner was hated by the Klan and his 'elimination' was discussed at meetings. The local Klavern was told that his death had been approved by Bowers, the Imperial Wizard, and that it would be taken care of. Prior to the killings Bowers told Jordan (a government witness) that 'Schwerner was a thorn in the side of everyone living, especially the white people and that he should be taken care of.' After the killings Bowers complimented Jordan, saying 'it was a job to be proud of.' After being interviewed by FBI agents Bowers wrote Dennis (one of those indicted), in code, on a typewriter, under an assumed name advising him that two representatives of the main plant (the FBI) accused him of being involved in the large logging operation (case of the missing civil rights workers). Bowers wrote 'that while the situation as regards the big logging operation is horrible, it is not hopeless. My experience this morning convinces me that the main plant is in possession of all the information regarding our secret logging operation due to the loose talk of some of our truck drivers (local officers in the Klan), but that as far as facts are concerned they have nothing of value for which they could sue us.' Bowers told Dennis he could show the letter to 'our scaler' (Klan investigator) and discuss it with other 'saw mill employees' especially those 'deep in the swamp.' (Those arrested at that time in connection with the killing of Schwerner, Chaney and Goodman.)
 
 
 52
 Also, Bowers, consistent with the policy of assisting only those in need on projects 'approved by the Klan,' sent money through Dennis to Roberts and Posey; Posey requested it for the defendants involved in this case.
 
 
 53
 Shortly after the bodies were found, Bowers told Dennis that he was pleased with the job, characterizing it as 'the first time Christians had planned and carried (out) the execution of Jews.'
 
 
 54
 Such testimony constitutes a wholly substantial basis, in connection with the surrounding circumstances, to support a conviction and the district court correctly denied the motions for acquittal.
 
 XI
 GRAND JURY MINUTES
 
 55
 Appellant Bowers argues that the trial court erred in denying his motion, at the trial, to inspect the minutes of the grand jury containing the testimony of two prosecution witnesses, Wallace Miller and Delmar Dennis. He contends that because these two witnesses stated that they were unable to recall many of the dates, times and circumstances surrounding the conspiracy, the grand jury minutes were needed to aid them in refreshing their memories.
 
 
 56
 Disclosure of grand jury minutes, authorized by Rule 6(e), Federal Rules of Criminal Procedure, is in the discretion of the trial judge. United States v. Socony-Vacuum Oil Company, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The secrecy of grand jury proceedings is to encourage witnesses to testify without fear of retaliation and to protect the independence of the grand jury. Pittsburgh Plate Glass Co. v. United States,360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959). Grand jury minutes should be made available only where, on the facts of a particular case, the interest of justice requires disclosure. A defendant is therefore required to make a particularized showing of need before disclosure may be granted. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); Pittsburgh Plate Glass Co. v. United States, supra; United States v. Proctor and Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); United States v. Socony-Vacuum Oil Co., supra; Stassi v. United States, 401 F.2d 259 (5 Cir. 1968).
 
 
 57
 The appellant relies exclusively upon Dennis v. United States, supra. None of the factors showing a 'particularized need' in Dennis are present in this case. Furthermore, in Dennis, it does not appear that the witnesses' statements to government agents had been made available to the defense.
 
 
 58
 In the case sub judice, the government, in compliance with 18 U.S.C. 3500 (the Jencks Act) produced and made available to the defense all statements FBI agents had received from Miller and Dennis during the investigation.
 
 
 59
 The appellant did not make any showing of 'particularized need' for disclosure of the grand jury minutes and the record clearly indicates the contrary. The trial court did not abuse its discretion in refusing to order the grand jury minutes produced for inspection by the defense.
 
 CONCLUSION
 
 60
 We have carefully considered the contentions made here by appellants and we find them without merit. Specifically, we find ample proof of conspiracy and each appellant's complicity in a calculated, cold-blooded and merciless plot to murder the three men. Upon consideration of the record as a whole, the trial was conducted fairly and impartially; no prejudicial error was committed and the judgment of conviction should be affirmed.
 
 
 61
 Accordingly, the judgment is affirmed.
 
 
 62
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 63
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 
 
 [1]
 Miranda, inter alia, states: 'Over the years the Federal Bureau of Investigation has compiled an exemplary record of effective law enforcement while advising any suspect or arrested person, at the outset of an interview, that he is not required to make a statement, that any statement may be used against him in court, that the individual may obtain the services of an attorney of his own choice and, more recently, that he has a right to free counsel if he is unable to pay. A letter received from the Solicitor General in response to a question from the Bench makes it clear that the present pattern of warnings and respect for the rights of the individual followed as a practice by the FBI is consistent with the procedure which we delineate today.' (384 U.S. 483, 484, 86 S.Ct. 1632, 1633) The warnings given Barnette were almost identical although not in strict compliance with Miranda regarding 'custodial' warnings
 
 
 [2]
 McMillian v. United States, 399 F.2d 478, 479 (5 Cir. 1968); Archer v. United States, 393 F.2d 124, 125 (5 Cir. 1968); Jennings v. United States, 391 F.2d 512, 514 (5 Cir. 1968); Yates v. United States, 384 F.2d 586, 588 (5 Cir. 1967); Evans v. United States, 377 F.2d 535, 536 (5 Cir. 1967)
 
 
 [3]
 E.g., Thaggard v. United States, 354 F.2d 735 (5 Cir. 1965) (Coleman, J., specially concurring), cert. den., 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301; Huffman v. United States, 297 F.2d 754 (5 Cir. 1962) (Brown, J. dissenting). See also, United States v. John Fioravanti, et al., 412 F.2d 407 (C.A.3, June 16, 1969), and United States v. Roscoe Brown, 411 F.2d 930 (C.A.7, June 6, 1969), where the Seventh Circuit criticizes Allen-type charges and, under its supervisory power has now prescribed the American Bar Association's recommended standards (American Bar Assn. Project on Minimum Standards for Criminal Justice, Trial by Jury 146-56, approved draft 1968.)
 
 
 [4]
 Thaggard v. United States, supra; Wilkins v. United States, 376 F.2d 552 (5 Cir. 1967), cert. den., 389 U.S. 964, 88 S.Ct. 342, 19 L.Ed.2d 379. See also, Walker v. United States, 342 F.2d 22 (5 Cir. 1965), cert. den., 382 U.S. 859, 86 S.Ct. 117, 15 L.Ed.2d 97; Estes v. United States, 335 F.2d 609 (5 Cir. 1964), cert. den., 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559; Andrews v. United States, 309 F.2d 127 (5 Cir. 1962), cert. den., 372 U.S. 946, 83 S.Ct. 939, 9 L.Ed.2d 970; Huffman v. United States, 297 F.2d 754 (5 Cir. 1962), cert. den., 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820. These decisions are consistent with those of other circuits. See, Cenedella v. United States, 224 F.2d 778 (1 Cir. 1955); United States v. Kahaner, 317 F.2d 459 (2 Cir. 1963); Rhodes v. United States, 282 F.2d 59 (4 Cir. 1960), cert. den., 364 U.S. 912, 81 S.Ct. 275, 5 L.Ed.2d 226; United States v. Barnhill, 305 F.2d 164 (6 Cir. 1962), cert. den., 371 U.S. 865, 83 S.Ct. 126, 9 L.Ed.2d 102; United States v. Furlong, 194 F.2d 1 (7 Cir. 1952), cert. den., 343 U.S. 950, 72 S.Ct. 1042, 96 L.Ed. 1352; Wegman v. United States, 272 F.2d 31 (8 Cir. 1959); Christy v. United States, 261 F.2d 357, 17 Alaska 107 (9 Cir. 1958), cert. den., 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535; Redfield v. United States, 295 F.2d 249 (9 Cir. 1961), affirming 197 F.Supp. 559 (D.Nev.1961); Robinson v. United States, 345 F.2d 1007 (10 Cir. 1965); DeVault v. United States, 338 F.2d 179 (10 Cir. 1964); Moore v. United States, 120 U.S.App.D.C. 203, 345 F.2d 97 (1965)
 
 
 [5]
 O'Brien v. United States, 5 Cir., 411 F.2d 522 decided May 19, 1969; Kyle v. United States, 402 F.2d 443 (5 Cir. 1968); Estrada v. United States, 392 F.2d 529 (9 Cir. 1968)