340 So.2d 157 (1976)
STATE of Louisiana
v.
Ezekiel JENKINS et al.
No. 56944.
Supreme Court of Louisiana.
October 14, 1976.
*160 Graydon K. Kitchens, Jr., Kitchens, Benton & Kitchens, R. Harmon Drew, Jr., Drew, White, Drew & Drew, Minden, Charles E. McConnell, McConnell & McConnell, Springfield, Stephen R. Burke, Minden, Ralph W. Parnell, Jr., Naff, Kennedy, Goodman, Stephens, Donovan & Parnell, Shreveport, for defendants-appellants.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Jr., Dist. Atty., James M. Johnson, James S. Harris, Asst. Dist. Attys., for plaintiff-appellee.
DENNIS, Justice.
Defendants, Jenkins, Waters and Paschal, were convicted of first degree murder and sentenced to death. The killing occurred when a teller of the Cotton Valley Branch of the Peoples Bank & Trust Company of Minden, Louisiana was fatally shot during a robbery on December 19, 1973. Defendants, who were tried jointly reserved seventy-one assignments of error. Twenty-nine of the assignments have been abandoned, and for the sake of clarity defendants have, in some instances, grouped more than one assignment under the heading of a single argument.
ASSIGNMENTS OF ERROR NOS. 1-5
Assignments of error numbers 1-5 were noted when the trial court denied defendants' motion for a change of venue (assigned *161 error number 1) and permitted the State to inquire whether witnesses on the motion for change of venue had an opinion as to whether a fair and impartial jury could be obtained in Webster Parish and whether defendants could receive a fair trial (assigned errors numbers 2-5).
A change of venue shall be granted only when the applicant proves that a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. La.C.Cr.P. art. 622.
We have reviewed the evidence in light of the standards set forth in State v. Bell, 315 So.2d 307 (La.1975) and State v. Berry, 329 So.2d 728 (La.1976). We find that defendants established there was widespread news coverage at the time of the offense in December, 1973. News of the arrest of the defendants and their indictment were also reported. The bulk of the coverage occurred shortly after the offense. Most of those testifying at the trial of the motion for a change of venue felt that although public opinion focused on the robbery-murder at the time of the offense, the publicity was neither excessive nor was public sentiment unduly inflamed at the time of trial of the motion in July, 1974. The news accounts themselves were neither overly sensational nor inflammatory. Trial of this case occurred in October, 1974. No other events in the community likely to affect the candor and veracity of the prospective jurors on voir dire were established.
On balance, we find no abuse of discretion by the trial court in denying the defendants' motion for change of venue. Thus, we find no reversible error in connection with these assignments of error.
ASSIGNMENTS OF ERROR NOS. 7, 8 & 9
Assignments of error numbers 7, 8 and 9 were reserved when the trial court denied defense motions to quash the grand jury venire and petit jury venire.
Defendants concede that the unconstitutionality of La.C.Cr.P. art. 402 forms no basis for the reversal of their conviction due to the prospective application of Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); Daniel v. Louisiana, 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975); State v. Rester, 309 So.2d 321 (La.1975).
Defendants contend, however, that some persons were systematically included and others entitled to claim personal exemptions were systematically excluded by the members of the jury commission. The evidence adduced indicates the jury commissioners utilized city directories, telephone books and other utility lists, and personal knowledge to obtain names for the jury venires. Some of the commissioners testified that they excluded the names of some persons known to possess personal exemptions under La.C.Cr.P. art. 403 who had claimed such exemptions in the past. Each commissioner followed his own policy in his own ward. One testified that he excluded no one, but the others stated they would exclude school teachers if they were aware of their occupations. As to other exempt persons the commissioners' practices varied. Some testified that they had no other persons of exempt occupations, such as the professions, residing in their wards.
This case is distinguishable from our recent holding in State v. Procell, 332 So.2d 814 (La.1976), wherein we reversed a conviction by a jury chosen from a venire from which the jury commission had purposely excluded all exempt persons. The Procell case was denied under La.Const. Art. I, § 16, Art. V, § 33 (1974) and La. Supreme Court Rule XXV after an effort to ease the Sabine Parish jury commission's transition from an unlawful to a lawful system of venire selection had proven fruitless. Cf. State v. Larue, 324 So.2d 384 (La.1976); State v. Lynch, 323 So.2d 781 (La.1975). The instant case was tried under the 1921 constitution, before the adoption of our court rule and recent more stringent policy toward jury commission improprieties.
Accordingly, when we apply the standards which were pertinent at the time of the trial of this case to the facts herein, which we find to reflect sporadic exclusions of some exempt persons and not a systematic *162 exclusion of all exempt persons, we conclude no reversible error occurred in the selection of the venire in this case.
ASSIGNMENTS OF ERROR NOS. 10, 11, 13, 14, 16, 17 & 31
All of these assignments of error stem from the trial judge's rulings relative to the defendants' efforts to discover certain oral inculpatory statements, and their attempts to have those statements suppressed. In response to defendants' motion for bill of particulars, in which defendants sought to determine whether the State held any written or oral inculpatory statements by any of them, the State informed the defendants in paragraph 9 of its answer, that to the best of its knowledge, defendants had made no written, taped, or video-taped statements. Further, the State, in paragraph 12 of its answer, declared that
"All other matters inquired about in the Motion for Bills of Particulars [presumably including the request for information relative to oral inculpatory statements to which the State's answer in paragraph 9 had been non-responsive] consists of evidence * * * which is not discoverable by defendants under any guise."
Thereafter, on October 3, 1974, approximately two weeks before trial, the district attorney advised Waters's counsel that the State held certain oral inculpatory statements made by Waters. Counsel moved to suppress these statements on October 7, and a show cause hearing was scheduled for October 15. At this hearing counsel for defendants Jenkins and Paschal first became aware that the State had oral inculpatory statements by their clients. Thereupon, counsel requested that the trial judge order the district attorney to supplement his answer to the motion for bill of particulars, in order to inform defendants of the date, time, place, circumstances, and person to whom the oral statements were made. The trial judge denied defendants' request for an order requiring the district attorney to amend the bill of particulars, and he ruled that under La.C.Cr.P. art. 703, defendants were not entitled to a pretrial evidentiary hearing on their motion to suppress the oral statements.
Defendants applied to this Court for supervisory writs, which were granted, and on October 18, this Court ordered the trial court to hold a hearing on the motion to suppress or to show cause why it should not be held. The trial judge then decided to hold the evidentiary hearing, and interrupted the selection of jurors in order to do so. Before the hearing commenced, defendants moved for a mistrial and/or to suppress the inculpatory statements and/or for a continuance. The trial court denied the motions for mistrial and continuance, and after hearing denied the motion to suppress. At this time the court also denied defendants' request for issuance of instanter subpoenas for F.B.I. Agent Donald F. Clemmer and for an individual identified as "Judge" who was incarcerated with defendant Jenkins in Flint, Michigan, where the oral statements were made, their presence being desired by defendants to attack the validity of the oral statements.
Defendants assign as error the trial judge's denial of their motion to require the district attorney to amend the bill of particulars; his denial of their motion for a continuance to enable them to defend against admission of the inculpatory statements; his denial of their request for a mistrial, urged on the ground that the State's answer to motion for bill of particulars was insufficient and prejudicial and misleading; his denial of their request for instanter subpoenas; and his denial of their motion to suppress the inculpatory statements. Defendants also urge that La.Code of Criminal Procedure article 703 is unconstitutional under the Equal Protection Clause of the United States Constitution insofar as it applies only to written confessions and physical evidence, and denies the right to a pretrial evidentiary hearing where oral inculpatory statements are challenged.
After careful review of the record and of defendants' contentions, we find that the trial judge committed no reversible error in making these rulings. It is abundantly *163 clear that the State is not required to reveal, in a bill of particulars, its possession of and intent to use oral inculpatory statements by an accused. State v. Watson, 301 So.2d 653 (La.1974); State v. McLeod, 271 So.2d 45 (La.1973); State v. Daniels, 262 La. 475, 263 So.2d 859 (1972), cert. denied, 410 U.S. 944, 93 S.Ct. 1378, 35 L.Ed.2d 610 (1973). In Daniels this Court observed,
"All of the information sought in the motion for a bill of particulars was given, save with regard to whether the State planned to use any oral inculpatory or exculpatory remarks, and the substance thereof.
"In response to these questions the State answered that it was not required to answer them at that time.
"Under our well-settled jurisprudence the rule which permits a pretrial inspection by an accused of written confessions or inculpatory statements does not apply to oral ones. State v. Lea, 228 La. 724, 84 So.2d 169 (1955); cert. den. 350 U.S. 1007, 76 S.Ct. 655, 100 L.Ed. 869; State v. Bickham, 239 La. 1094, 121 So.2d 207 (1960), cert. den. 364 U.S. 874, 81 S.Ct. 123, 5 L.Ed.2d 98; State v. Manuel, 253 La. 195, 217 So.2d 369 (1968); and State v. Pesson, 256 La. 201, 235 So.2d 568 (1970).
"Because appellant was not entitled to information concerning oral statements, and because the other information sought in the motion for a bill of particulars was furnished by the State in its answer thereto, the answer was sufficient."
Defendants' reliance on State v. Boothe, 310 So.2d 826 (La.1975), is misplaced. In Boothe, the State responded to defendant's request, by motion for bill of particulars, for any confessions, admissions, or adverse statements by the accused, that it had no such statements. In fact, the State had and used at trial oral inculpatory statements made by the accused in the presence of five police officers. The State's response that it had no statements implied that it had none whatsoeveroral or written. As a result, defendant was lulled into a misapprehension of the strength of the State's case and suffered severe prejudice when the officers' testimony was subsequently introduced. Here the State responded to defendants' inquiries that it had no written, taped, or video-taped statements. This response does not imply that the State has no oral statements. Furthermore, the State's declaration in paragraph 12 of its answer, that other requested information was not discoverable further militates against the conclusion that the State misled the defendants by its answer to their motion for bill of particulars.
In Boothe this Court carefully avoided ruling that oral inculpatory statements are discoverable. We said,
"* * * Without consideration of whether the contents of oral confessions are subject to pre-trial discovery in a motion for a bill of particulars or in a prayer for oyer (Cf. State v. Nelson, 306 So.2d 745 (La.1975)), there is no justification for judicial approval of patent misrepresentation on the part of the State when an item in an application for a bill of particulars seeks to discover oral confessions or inculpatory statements. To the contrary, the Court has previously addressed itself to a situation wherein the State deliberately misled defendants into believing that it had no confessions or inculpatory statements. In State v. Bendo, 281 So.2d 106 (La.1973), the Court reversed the defendants' convictions on the basis that the State's failure to allow pre-trial inspection of the tape-recorded inculpatory statements was error. The tape-recorded statements were distinguished from mere oral statements and placed in a category of discoverable statements, along with written statements (see State v. Dorsey, 207 La. 928, 22 So.2d 273 (1945)) and video taped statements (see State v. Hall, 253 La. 425, 218 So.2d 320 (1969)). * * *" 310 So.2d at 829-30.
Neither does State v. Bendo, 281 So.2d 106 (La.1973), stand for the proposition that oral inculpatory statements are discoverable by bill of particulars. In that case we *164 merely held that tape-recorded statements are discoverable under the previously announced rules of Dorsey and Hall.
Because the State is not required to inform defendants in its bill of particulars of its possession and intended use of oral inculpatory statements, the trial court committed no error in denying defendants' motion for an order requiring the district attorney to supplement the bill of particulars with information relative to the defendants' oral inculpatory statements.
Defendants' contention that the trial judge erred in failing to grant a mistrial, based on the State's supposed insufficient, prejudicial, and incorrect bill of particulars, is likewise without merit. The bill of particulars was, as we have noted, sufficient under present law. Defendants failed to establish that the bill of particulars constituted "a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law." La.C.Cr.P. art. 775. Furthermore, article 775 places the determination of whether to grant a mistrial on this basis within the sound discretion of the trial judge. We find no abuse of that discretion in this case.
Our examination of the record and our appreciation of defendants' arguments, in brief and before this Court, persuade us that the trial judge did not commit manifest error in denying defendants' written motion for a continuance prior to the evidentiary hearing on the motion to suppress. La.Code of Criminal Procedure article 708 provides:
"A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced."
The trial judge had no statutory authority to grant the requested continuance, because according to La.Code of Criminal Procedure article 761, the trial had begunjury selection had begun before the hearing on the motion to suppress was scheduled and held. The trial judge could have granted only a recess. Compare, State v. Sharp, 321 So.2d 331 (La.1975). In Sharp this Court observed that
"* * * [T]he repeated references to a trial continuance were improper since, according to the provisions of La.C.Cr.P. art. 708, only a recess could have been granted at this point, trial having commenced. Nevertheless, the same standard is applicable to judge the propriety of the trial court's ruling on a request for recess. In State v. Richmond, 284 So.2d 317 (La.1973) that standard was articulated:
"The grant or denial of a recess is largely within the well founded discretion of the trial court * * * where the defense did not make a showing of a compelling reason for granting a recess, at the time the motion was made, it cannot be said the trial court abused its discretion by refusing the recess.' 284 So.2d at 326." 321 So.2d at 333.
Defendants failed to ask for a recess; more importantly, they failed to establish what prejudice they suffered by the trial court's denial of their request, assuming that the trial judge should have regarded it as a motion for recess. This Court will adhere to the general rule that the trial judge's determination of whether to grant a recess rests in his sound discretion and will not be overturned absent clear abuse. State v. Brown, 322 So.2d 211 (La.1975); State v. Sharp, supra; State v. Richmond, 284 So.2d 317 (La.1973).
Similarly, we find no error in the trial judge's denial of defendants' request that instanter subpoenas issue for Agent Clemmer and "Judge." The trial judge reserved his ruling on whether such subpoenas would issue until after hearing on the motion to suppress. After the hearing the request was denied. The trial court in its per curiam to this assigned error explained its ruling as follows:
"NO. 14. Defendants elected not to testify at the hearing on the motion to suppress and there was no showing otherwise *165 that these witnesses would have given contrary testimony to any heard by the Court."
Initially we observe that La.Code of Criminal Procedure article 741 ("Method of obtaining a witness from another state") provides inter alia:
"If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions or grand jury investigations commenced or about to commence in this state, is a material witness in a prosecution pending in a court of record in this state, or in a grand jury investigation which has commenced or is about to commence, a judge of such court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness shall be required." (Emphasis supplied).
The language is discretionary, and in order to reverse we must find both that the judge abused his discretion and that the witnesses were material. We do not find either to be the case.
This Court ruled in State v. Chavers, 294 So.2d 489, 493 (La.1974), that an accused's right to compulsory process "* * * does not include within its compass the summoning * * * of all witnesses demanded by the accused, regardless of whether their testimony is material or relevant." In Chavers, we rejected defendant's argument that he was entitled to subpoena out-of-state witnesses without establishing first that their testimony would be relevant and material to the defense. In State v. Square, 257 La. 743, 244 So.2d 200 (1971), this Court found no error in the trial court's refusal to subpoena two out-of-state witnesses to testify at a hearing on defendant's application for admission to bail. Finding the question mooted by defendant's failure to utilize proper procedures, this Court nevertheless commented,
"The testimony of these two witnesses was belatedly sought to help establish analibi for Square. But a number of witnesses testified to this fact at the hearing, and the testimony of the witnesses Modicue and Amphy would have been cumulative. Furthermore, without Modicue's address he, of course, could not be subpoenaed. La.Code Cr.P. arts. 738, 739, 740. * * *" 257 La. at 775-76, 244 So.2d at 211.
In the case at bar the trial judge had reason to believe that the testimony of Agent Clemmer would have been merely cumulative, repeating testimony given by other agents at the hearing. Further, defendants failed to make any showing that "Judge's" testimony would be relevant and material to their case. The trial judge was influenced by the defendants' failure to take the stand in order to contradict the evidence presented by the State at the hearing on the motion to suppress, particularly since that testimony would not be admissible at the subsequent trial on the merits. We are, therefore, unable to conclude that the trial judge's denial of the requested subpoenas was error.
Defendants' contention that the trial court erred in overruling their motion to suppress the "oral and/or written statements and/or confessions" is unsupported by the record. La.Code of Criminal Procedure article 703 provides inter alia:
"C. On the trial of a motion to suppress filed under the provisions of this article the burden of proof is on the defendant to prove the grounds of his motion, except that the state shall have the burden of proving that a purported written confession or written inculpatory statement was made freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
The trial judge in his per curiam summarized his reasons for overruling this motion by stating "* * * that the State carried the burden imposed upon it of establishing the voluntary nature of the statements and defendants did not meet the burden of proving that the motion had merit." A review of the transcript of the hearing on the motion to suppress supports these findings.
*166 Finally, we note that defendants vigorously argued that La.Code of Criminal Procedure article 703 is unconstitutional insofar as it prevents challenges to the admissibility of oral inculpatory statements in a motion to suppress. We find it unnecessary to rule on this question because these defendants were afforded an opportunity to challenge oral inculpatory statements by motion to suppress as a result of the exercise of our supervisory jurisdiction. This issue is therefore moot.
For the reasons assigned, we find that defendants' assignments of error numbers 10, 11, 13, 14, 16, 17 and 31 are without merit.
ASSIGNMENTS OF ERROR NOS. 21 and 34
Defendants urge that the trial court erred in its refusal to grant their request for severance.
La.Code of Criminal Procedure article 704 provides:
"Jointly indicted defendants shall be tried jointly unless:
"(1) The state elects to try them separately; or
"(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance."
As suggested by the Official Revision Comment to this article, and according to the settled jurisprudence of this State, the trial judge's determination of whether to grant or deny severance rests in his sound discretion, and this Court will not reverse his ruling absent clear abuse. State v. Frierson, 302 So.2d 605 (La.1974); State v. Medlock, 297 So.2d 190 (La.1974); State v. Shaffer, 260 La. 605, 257 So.2d 121 (1971). In State v. Thibodeaux, 315 So.2d 769 (La.1975), we recently had occasion to overturn a trial judge's denial of a motion for severance. In Thibodeaux, Sallettes, a co-defendant in a possession with intent to distribute marijuana case, established by convincing evidence that his co-defendant's (Thibodeaux's) defense would be to urge that the drugs were Sallettes's and that he (Thibodeaux) had no knowledge of their existence. We found that, in the light of Sallettes's showing, the trial judge's denial of a severance was an abuse of discretion, because it had the effect of requiring Sallettes to defend "not only against the state, but also against his co-defendant." We note that in the case at bar Jenkins, Waters and Paschal did not make a convincing showing to the trial judge of genuinely antagonistic defenses in the present case.
Mere allegations by co-defendants that defenses will be antagonistic do not require the trial judge to sever. Co-defendants seeking severance must present convincing evidence to the trial judge of actual antagonism. State v. Thibodeaux, supra; State v. Medlock, supra; State v. Ross, 263 La. 271, 268 So.2d 222 (1972). The record reveals that, at the time the trial judge was called upon to rule on the motions for severance, defendants herein had made broad and unsupported allegations of antagonism only; they did not establish by convincing evidence that their defenses would actually be antagonistic.
Defendants also urge that the trial judge's refusal to sever effectively prevented them from calling their co-defendants as witnesses. We note that this contention was not presented to the trial court in defendants' motion for severance or in their argument before the judge's ruling. Furthermore, this Court has on several occasions considered this same argument, and has consistently ruled that a co-defendant is not entitled to a severance simply because he desires to call his co-defendant as a witness in his own behalf. State v. Medlock, supra; State v. Baker, 288 So.2d 52 (La.1973); State v. Hudson, 253 La. 992, 221 So.2d 484 (1969), reversed on other grounds, 403 U.S. 946, 91 S.Ct. 2282, 29 L.Ed.2d 856 (1971); State v. Kemp, 251 La. 592, 205 So.2d 411 (1968). In Kemp, co-defendants urged,
"* * * [T]hat consolidation of these cases was improper `because both defendants made known their desire to call the other as a witness,' and consolidation *167 gave each defendant the right to refuse to testify for each was a party accused at the trial; that is to say, each defendant was deprived of his right to compulsory process of the other defendant, who, as an accused, could not be compelled to take the stand.
"This argument is without merit. Only one transaction is involved here because the evidence at the trial points to the fact that Nolen fired upon Coy Turner's car from ambush in a wooded area, and Kemp was waiting for him nearby in the getaway carthey acted together.
"Under Fifth Amendment rights, therefore, these defendants could refuse to testify concerning the facts of the case whether they were tried jointly or separately. Each defendant was in a position to contend at separate trials that testimony concerning the transaction giving rise to the charges in which both were actors, might tend to incriminate him." 251 La. at 602, 205 So.2d at 414-15.
The mere fact that La.R.S. 15:474 makes a co-defendant competent to testify in his co-defendant's behalf does not guarantee that he will testify, even when a severance is granted. Defendants here, as in State v. Medlock, supra, made no showing of "their willingness to testify on each other's behalf if severance was granted."
Despite their failure to satisfy Louisiana jurisprudential guidelines requiring co-defendants seeking severance to present to the trial judge convincing evidence that severance is necessary in the interest of justice because of genuinely antagonistic defenses, or to enable willing co-defendants to testify in their behalf, defendants contend that severance was necessary under the rule announced by the United States Supreme Court in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Defendants contend that the State's use of Waters's and Paschal's oral inculpatory statements had the effect of inculpating each of the co-defendants, and that because none of the defendants took the stand, that each was denied his right of confrontation, as guaranteed by the United States and Louisiana Constitutions. In Bruton, the United States Supreme Court invalidated the petitioner's conviction because a co-defendant's confession, inculpating the petitioner as well as the declarant, had been admitted at trial, albeit the trial judge had given clear and precise instructions to the jury that the confession was to be used only with respect to the declarant, and that it should be disregarded with respect to his co-defendant. The Supreme Court reversed the prior rule established by Belli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), and held that,
"* * * [T]he introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all. * * *" 391 U.S. at 137, 88 S.Ct. at 1628, 20 L.Ed.2d at 485-86.
In order to side-step the constitutional problems generated by Bruton, the inculpatory statements offered by the State in the present case were carefully redactedreferences to co-defendants were deletedso that each statement, as it was presented to the jury, contained no references to the identity of the declarant's accomplices.
Defendants contend that, in spite of the State's efforts to "sanitize" the inculpatory statements by deleting references to the identities of the declarant's accomplices, the statements indirectly inculpated each defendant to such a degree that Bruton applies and reversal is necessary.
The oral statements complained of were related to the jury by F.B.I. Agent Duvall who had interviewed the defendants and other witnesses in Flint, Michigan several weeks after the bank robbery. Prior to giving his testimony Agent Duvall was admonished *168 by the court, and apparently also by the district attorney, to delete from each statement references to all persons other than the defendant.
The F.B.I. agent testified as to what transpired during his interview with defendant Waters on January 8, 1974, in pertinent part, as follows:
"* * * At this time he was informed by me that his fingerprints or prints had been found in a bank which had been robbed in Louisiana and compared to his fingerprints and they were found to be identical. I also advised him at this time that a lady had been shot and killed during this bank robbery, at which time Mr. Waters indicated to me that he had some participation in this and that he wanted to advise what his part was and he desired to tell everything that probably happened. At this time he indicated to me that in the middle of December, 1973, he could not recall exact date that he come to Louisiana in a 1966 Oldsmobile, a black top, white-grayish bottom. He arrived in a small town in Louisiana, name unrecalled by Mr. Waters. He stayed that night in an outhouse on a farm in the automobile all night. He advised the next day he went to a bank in this small town the automobile was parked in the parking lot and that he entered the front door of this bank and walked to the left side of the bank where there were some ladies' purses. He become excited and panicky in the bank and run out the back doorin front of him was another man who was also running from the bank. As he came out the back door, the side door of the bank . . . .
"Q. Tell us in what direction he went from there?
"A. He went to the parking lot where the car was when he got out of it, however, the car wasn't there and he had to run to the front of the bank and get into the automobile, at which time he left the scene of the bank, drove back to Flint, Michigan through Arkansas, he recalledhe believed St. Louisarrived at Flint, Michigan the following night.
"* * *
"During that interview did he state to you that anything was thrown out from this car?
"A. He advised on the way back to Flint that there were several items, papers and items as he called, which he did not recall which were thrown from the car a short distance from the bank. He did not know what road they were on or the exact mileage or distance from the bank, other than it was a short distance.
"Q. Did you inquire to him about his participation in any money?
"A. Yes, when he returned to Flint, Michigan, he had received approximately $4,000.00 from this trip to Louisiana."
Next, Agent Duvall related to the jury the essence of his oral interview with the defendant William Paschal, which occurred on January 10, 1974 in Flint, Michigan:
"He gave himself up indicating to me that he was very worried about a bank robbery that had occurred in Louisiana and that he had come to my office to surrender himself and that he desired to give himself up and straighten this matter out. He wanted to tell the whole story of the robbery to the F.B.I.
"Q. Did he state to you he was aware that people in the bank had been injured by gunshot?
"A. Well, he had heard that they had been injured.
"Q. Did he tell you that?
"A. Yes, he did.
"Q. All right, and then what did he tell you?
"A. He stated that in the middle of December, 1973, about a week before Christmas of that year that he had come to Cotton Valley, Louisiana, to a farm nearby belonging to his mother.
"Q. In what?
"A. In a 1966 Oldsmobile, black-top blue bottom, light-blue bottom, which was his; that he had spent the night in an outhouse, and [sic] outbuilding and the next morning that he had driven this automobile to a bank, small bank in Cotton *169 Valley, Louisiana; that he had parked the car in the parking lotI believe at this time he drew a sketch of just where this car was located in connection with the bankthat he was sitting in this car and he heard what he thought was gunshots inside of the bank and he looked up and observed a man coming out the side door of the bank into the parking lot and fall. He indicated that he was going to the assistance of this man, but realized that the bank had been robbed, that he would probably be determined to be one of the bank robbers. At which time he drove his car to the front of the bank and started honking the horn. David,[1] at a short time later, because of his fear he drove directly from the bank to Flint, Michigan, through Arkansas, recalling that he went through Magnolia, Arkansas, I believe Little Rock and St. Louis, Missouri; he had run into some snow and they had to change routes and that he then arrive in Flint, Michigan the following night.
"Q. And where did he go in Flint, Michigan?
"A. He went to his apartment.
"Q. Which was where?
"A. Which is, I believe at 711 East Myrtle.
"Q. Did he state to you or in response to any question that he obtained some money?
"A. He obtained about $450.00 for that trip.
"* * *."
Agent Duvall also interviewed defendant Ezekiel Jenkins on January 11, 1974 in Flint, Michigan, but Jenkins denied any complicity in the bank robbery and maintained that he had been in the State of Michigan during the entire time in which the events surrounding the crime occurred.
However, Jenkins's girlfriend, Ollie Johnson, was called as a witness by the State and testified that Jenkins had been absent from their residence from December 16, 1973 to December 23, 1973; that when he returned he had a large amount of cash in approximately ten stacks, which he counted out on a bed; and that he told her he was in trouble and mentioned something about the bank.
Thus it is clear that neither of the statements, standing alone, tended to inculpate anyone other than the confessor. However, defendants argue that, when considered in light of the testimony of Ollie Johnson and the other evidence admitted at trial, the statements of Paschal and Waters tended to inculpate each of the defendants with the commission of the bank robbery and killing which occurred in Cotton Valley, Louisiana on December 19, 1973. The question presented for our decision is whether the admission of these statements constituted an abridgement of the federal or state constitutional guaranty of each defendant to confront and cross-examine the witnesses against him.
A review of the post-Bruton decisions by this Court and the federal courts leads us to the conclusion that such an abridgement did not occur in this case. In State v. Herman, 304 So.2d 322 (La.1975), this Court reversed defendant's conviction where the record reflected a direct violation of Bruton. A statement made by Herman's co-defendant, naming and directly inculpating him, was introduced at trial over his objection. We held that Bruton prohibited the conduct complained of, and in the course of our opinion declared,
"In Bruton the Supreme Court held that when the state puts two defendants on trial in the same case, any statement made by one defendant which inculpates *170 the other defendant cannot be admitted at the trial. This problem is created by the hearsay rule and the Sixth Amendment confrontation clause. In many instances the state can introduce a statement made by a defendant. Although technically hearsay, probative value is assured because it is an admission against interest. Obviously, no confrontation problem exists when the defendant's own statement is used against him. However, when two defendants are on trial in the same proceeding an additional problem is created. As to the co-defendant against whom the statement is used, the hearsay exception of an admission against interest is not applicable because the co-defendant did not make the statement, and the Sixth Amendment confrontation clause is violated because the co-defendant has no opportunity to cross-examine the person who made the statement. Any questions of the author of the statement will be met by the privilege against self-incrimination provided by the Fifth Amendment. Formerly this problem was solved by allowing the state to introduce the statement against only the defendant who made it provided the trial judge instructed the jury not to consider the statement when deciding the guilt or innocence of the other defendant. See Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). This procedure was found to be deficient in the Bruton case. In Bruton the court held that the jury could not be expected to consider the admitted statement against one defendant but not against the other.
"The court therefore concluded that the only way to protect the rights of the other defendant was to bar the introduction of the statement. When the state plans to use a statement by one of the co-defendants, they must be tried separately." 304 So.2d at 323-24.
Although we wholly agree with and reaffirm our opinion and holding in Herman, the language therein requiring separate trials should not be taken out of context and applied literally to all cases. Undoubtedly, in all cases where a defendant's testimony tends to inculpate not only the declarant, but his co-participants as well, the best procedure is to try each defendant separately. However, it may be possible validly to try them jointly, if the declarant's statement is redacted or edited so that it does not identify the co-participant. If the declarant's statement is not so redacted, or not susceptible to such redaction, then, as we held in Herman, the co-defendants must be tried separately.
In the original hearing in State v. Kaufman, 278 So.2d 86 (La.1973), this Court recognized as valid the procedure of deleting references to co-defendants. Although we granted a rehearing and reversed defendants' convictions on the basis of racially prejudicial remarks made at trial, language from our original opinion is instructive:
"It is contended that the State should have tried these defendants separately, for by trying them jointly the rule established in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), was violated. There it was held that admission at the joint trial of a codefendant's extrajudicial confession incriminating the other defendant violated the latter's right of cross-examination under the Confrontation Clause of the Sixth Amendment to the United States Constitution. The trial judge overruled the contention on the authority of State v. Hopper, 253 La. 439, 218 So.2d 551 (1969), and Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).
"The several witnesses who testified to extrajudicial inculpatory statements made by Kaufman and Dotch were carefully instructed by the State's attorney when the question was asked to testify only to the statements made by either Kaufman or Dotch concerning himself. They were instructed not to testify to anything in the inculpatory statement which may have concerned someone else. Then, when defense counsel objected, the witnesses were instructed by the judge not to testify concerning what was said by Kaufman or Dotch, as the case might be, except insofar as the statement concerned *171 the particular defendant whose inculpatory statement was then the subject matter of interrogation. Moreover, the jury was additionally instructed that the testimony was to be considered as relating only to the particular defendant whose inculpatory statement was then in question and no one else.
"And when the witnesses were permitted to testify, they testified only with respect to the inculpatory statement of the one defendant whose statement was then at issue without mention of or reference to the other. The State's attorney, the trial judge and the witnesses were extremely careful when they were concerned with the inculpatory statement of one defendant not to refer to the other defendants in any particular. Thus no deprivation of the right to confrontation occurred. The inculpatory statement complained of made no mention of the other defendant and the inculpatory statement was not testimony `against' the other defendant.
"The rulings of the trial judge on this issue were correct." 278 So.2d at 90-91.
We note that the procedures followed in the case at bar are virtually identical with those we were willing to sanction in Kaufman.
We are fortified in our conclusion that the trial court did not commit reversible error in denying severance in this case by several federal cases presenting many of the issues raised by the defendants herein.
In United States v. Gregg, 414 F.2d 943 (7th Cir., 1969), one of appellant's arguments for reversal was based on the trial court's denial of his request for severance; a co-defendant's statement had been introduced at trial but appellant's name had been edited out of the statement. In considering whether Bruton required reversal, the court observed,
"Appellant, like Bruton, had sought and been denied a separate trial. As in Bruton, a confession of the co-defendant was admitted in evidence. Unlike the procedure in Bruton, appellant's name was edited out of the statement. In Bruton, the jury had been instructed as to Bruton to disregard the co-defendant's statement which inculpated both Bruton and the co-defendant. On appeal the statement had been held inadmissible as to the co-defendant and the co-defendant's conviction was set aside. Bruton's conviction was affirmed because the jury had been instructed to disregard the statement as to him, on the authority of Delli Paoli v. United States, 1957, 352 U.S. 232, 239, 77 S.Ct. 294, 1 L.Ed.2d 278, that the instructions were sufficiently clear and it was reasonably possible for the jury to follow them. The Supreme Court reversed that decision.
"* * *
"The question before us is therefore whether Bruton requires reversal of the conviction in this case.
"The Supreme Court in Bruton in speaking of alternative methods to admit a confession against the confessor without infringing the non-confessor's right of confrontation refers in a footnote (391 U.S. 134, 88 S.Ct. 1620), to deleting references to co-defendants. That was precisely the procedure followed here.
"Special F.B.I. Agent John William Davis testified to the oral statement made by the co-defendant after the latter had been advised of his rights. The statement clearly inculpates the co-defendant and an unnamed friend who assisted him in the robbery.
"* * *
"Appellant argues that the jury must have assumed that he was the unnamed friend. However, the appellant's defense was not based on the theory that no robbery had occurred or that two robbers were not involved in it, but on the theory that he was not one of those two; that the police had arrested the wrong man and had allowed the other companion of the co-defendant, the real culprit who had robbed the Bank with the co-defendant, to escape through investigative ineptitude.
"* * *
"Because of the particular circumstances of this case, the danger sought to be *172 avoided by Bruton: the use of limiting instructions as a substitute for the constitutional right of cross-examination, did not arise.
"We find no reversible error. The judgment of the District Court is affirmed." 414 F.2d at 948-49.
In Yates v. United States, 418 F.2d 1228 (6th Cir. 1969), a written confession by one co-defendant was introduced at trial, the names of co-defendants having been masked out of the statement which otherwise would have inculpated them too. In discussing whether Bruton had been violated the court noted,
"The district judge held that the standard of Bruton, supra, was not violated by the admission of Bova's statement in the form in which it was admitted. We agree. The case at bar is distinguishable on its facts from the Bruton case. By the time Bruton got to the Supreme Court the conviction of the petitioner's co-defendant, whose confession was involved, had been reversed by the Court of Appeals on the ground that the confession should not have been admitted into evidence. Thus Bruton may have been prejudiced by a confession which should not have been admitted in the first place. However, we understand that the Bruton principle is not limited to that particular fact.
"The Court said in Bruton at page 135, 88 S.Ct. at page 1627,
"`We agree that there are many circumstances in which this reliance (that the jury will follow instructions) is justified. Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. "A defendant is entitled to a fair trial but not a perfect one." (Citations omitted.) It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information.'
"We think this is such a case. The trial judge took adequate precaution to avoid any prejudice to Yates by reason of the admission of Bova's confession. It appears to us that he satisfactorily did so and we also rely on his judgment that he accomplished his purpose." 418 F.2d at 1229.
While the issue before the court in Yates was one involving a written confession, we find the approach taken by the court therein relevant and instructive.
The Fifth Circuit Court of Appeals in Posey v. United States, 416 F.2d 545 (5th Cir., 1969), in considering whether admission of a co-defendant's redacted confession violated appellant's rights of confrontation under the Bruton rule, held,
"This court, as well as others, has held that there is no error in the admission of a co-defendant's confession, if all references to the other defendants are deleted and there is no `substantial threat' to the right of confrontation and cross-examination. Menendez v. United States, 393 F.2d 312 (5 Cir. 1968); Barton v. United States, 263 F.2d 894 (5 Cir. 1959); Calloway v. United States, 130 U.S.App.D.C. 273, 399 F.2d 1006 (1968); Oliver v. United States, 118 U.S.App.D.C. 302, 335 F.2d 724 (1964); Kramer v. United States, 115 U.S.App.D.C. 50, 317 F.2d 114 (1963).
"* * *
"Failing to bring themselves within the ambit of the Bruton decision, the appellants' Constitutional rights were not infringed by either the admission of Barnette's confession or their joint trial." 416 F.2d at 551.
Other federal cases support the view that statements inculpating not only the declarant, but his co-defendants as well, may be redactedby deletion of references to the co-defendantsand as a consequence rendered admissible against the declarant in a trial against all co-defendants without violation of the constitutional principles underlying Bruton v. United States, supra. United States v. Kershner, 432 F.2d 1066 (5th Cir., 1970); United States v. Panepinto, 430 F.2d 613 (3d Cir., 1970).
*173 Additionally, the model provisions set forth in American Bar Association Standards for Criminal Justice Relating to Joinder and Severance, Standard 2.3 (1968), afford support for the proposition that redaction is a viable means of circumventing the Bruton problem while allowing joint prosecution of co-defendants. Standard 2.3(a) of the Joinder and Severance Standards provides:
"(a) When a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to him but is not admissible against him, the court should determine whether the prosecution intends to offer the statement in evidence at the trial. If so, the court should require the prosecuting attorney to elect one of the following courses:
"(i) a joint trial at which the statement is not admitted into evidence;
"(ii) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been [effectively] deleted, provided that, as deleted, the confession will not prejudice the moving defendant; or
"(iii) severance of the moving defendant." (Emphasis theirs).
We thus conclude that, while the preferable course would have been for the State to try these defendants separately, because of the care exercised by the State to insulate each defendant from the effects of his codefendant's statements, there was no constitutional defect in trying them jointly.
Defendants express concern that in redacting the inculpatory statements, the State's witness omitted potentially exculpatory material which would have benefitted one or both of the declarants. We observe that counsel for each defendant had ample opportunity to elicit this allegedly exculpatory material when they cross-examined Agent Duvall.
As a result of the foregoing defendants' contention that the trial judge committed reversible error in denying their motion to sever is without merit.
ASSIGNMENTS OF ERROR NOS. 40-49, 52-55 & 61
Assignments of error numbers 40-49, 52-55 and 61 pertain to the denial by the trial court of defendants' motion to suppress evidence allegedly obtained during the search in Flint, Michigan of an automobile operated by one Johnny Bell which was also occupied by defendant David Waters (assignments of error 54 and 55), and the trial judge's admission, over defense objections, of evidence obtained directly and indirectly as a result of that search and seizure (assignments of error 40-49, 52, 53 and 61).
The motion was filed after the commencement of trial, and the trial court unnecessarily interrupted the proceedings in order to conduct a hearing on the motion. Counsel for all three defendants sought in the motion to suppress, primarily, evidence obtained from Waters as the result of an unconstitutional search of the automobile, and, secondarily, all other evidence which was later uncovered as a result of the search. The motion should not have been entertained because under the authorities pertinent at the time of this trial Jenkins and Paschal, who were not present at the time of the search, had no standing to contest it. Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); State v. Vassel, 285 So.2d 221 (La.1973). Waters had ample opportunity to file a motion to suppress the evidence prior to the trial, and was certainly aware that the evidence was obtained by the law enforcement officials. Under these circumstances, defendant cannot complain of an unconstitutional search, if any. For an accused to invoke the rule excluding evidence obtained by an alleged illegal search and seizure it is necessary for him to file a pre-trial motion to suppress the evidence under La.C.Cr.P. art. 703, and the failure to do so in the absence of a showing of surprise or lack of opportunity to file such a motion operates as a waiver of any claimed violation of constitutional rights against searches and seizures. State v. Cormier, 272 So.2d 686 (La.1973) and authorities cited therein.
*174 Nevertheless, since defendants were afforded a hearing on their motion without objection by the State, we have decided to review these assignments on their merits.
The background facts are as follows: at approximately 2:00 a.m. on December 21, 1973, Michigan State Trooper Lawrence A. Bak stopped a vehicle for failing to signal a right turn. The driver, Johnny Bell, had no driver's license and was therefore placed under arrest. While both Bell and his passenger, David Waters, were out of the vehicle, Trooper Bak conducted a weapons search of the portions of the vehicle which would be readily accessible to the driver or passenger. Under the front seat, the officer discovered a paper bag full of money. Upon inquiry as to the source of the money David Waters stated that he got the money selling narcotics in the Flint, Michigan area. Trooper Bak conducted a warrant check on defendant Waters. Upon being advised that a bench warrant was outstanding for Waters' arrest, the officer also placed Waters under arrest. There was a conflict between his testimony and Bell's as to whether Waters' arrest occurred before or after the discovery of the money. The money, however, was returned to Waters and he used $100 of it to post bail for Bell. In the presence of the officers Waters gave the bag of currency to Bell and told him to take it to his girlfriend, Shirley Earnest. Strangely enough, Ms. Earnest was an employee of the Michigan State Police Force, and the next day she was questioned about the money by her superior officer. When she admitted having the cash he informed her that Waters had previously been convicted of bank robbery and that she could be charged as an accessory if it turned out she was holding proceeds from another crime. She promptly turned the money over to the police with an agreement it would be returned to her if they determined no criminal activity was involved. Following this, substantial evidence against the defendants was gathered by the Michigan, Louisiana and federal law enforcement agencies. Fingerprints, identifications and items discarded by the defendants after the crime were secured in Louisiana. Confessions and other evidence were obtained from Paschal and Waters and from a search of Jenkins's house. William Paschal's purchase of a weapon used in the robbery was traced to Stevens Department Store, Atlanta, Georgia.
It is likely that the discovery of the money in Bell's car played a significant part in developing this evidence. Exactly what part, however, is not clear from the record. Many questions were left unanswered. Were the F.B.I. agents able to trace the numbers on the money, which was not used in evidence, to this particular bank robbery? Did they circularize Waters' photograph to all recent bank robbery sites in the nation? If Bell was correct in testifying that Waters was arrested before the search of the car, would he have been questioned and confessed regardless of the discovery of the cash? Could the discovery of the weapon used in the bank robbery by Louisiana law enforcement officers have led independently to an identification of the defendant who purchased it?
This Court is of the opinion that evidence illegally obtained need not be suppressed if the causal connection between the unlawful conduct and the evidence actually introduced at trial has "become so attenuated as to dissipate the taint." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939). The principal purpose for the exclusionary rule in search and seizure cases is to deter unlawful police activities. United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561, 571 (1974). In determining whether information obtained by officers in the conduct of an unlawful search was used to acquire other evidence against an accused, the test to be applied is not whether, but for the illegal search the evidence would not have been obtained, but rather "`whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, *175 487-88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1971), quoting Maguire, Evidence of Guilt 221 (1959).
Two exceptions have developed to the general rule requiring that evidence illegally acquired "shall not be used at all." Silverthorne Lumber Company v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920). The first is that the same evidence was discoverable from an independent source. The second is that articulated by the United States Supreme Court in Nardone v. United States, supra, that the connection between the unlawful police conduct and the challenged evidence has "become so attenuated as to dissipate the taint." See, United States v. Turk, 526 F.2d 654, 661 (5th Cir. 1976) ("the doctrine of `attenuation' permits the introduction of evidence which bears only a very indirect relation to the illegal search"); United States v. Owen, 492 F.2d 1100, 1107 (5th Cir. 1974) (the Fifth Circuit "has developed several guidelines to help determine when the taint of an illegal arrest is sufficiently dissipated that evidence secured after the arrest is admissible in a criminal trial. * * These guidelines include the proximity of the illegal arrest to the procurement of the evidence; the intervening occurrences between the arrest and the acquisition of the evidence, and the circumstances under which the arrest was made." [Citation omitted]). See also, United States v. Villano, 529 F.2d 1046, 1059 (10th Cir. 1976); United States v. Houltin, 525 F.2d 943, 947 (5th Cir. 1976); Parker v. Estelle, 498 F.2d 625, 629-30 (5th Cir. 1974); United States v. Strickland, 493 F.2d 182, 186-87 (5th Cir. 1974). See generally, Annotation, "Evidence'Fruit of the Poisonous Tree," 43 A.L.R.3d 385, § 8 (1972) and cases referred to therein.
Because of the many factual questions left unanswered by the record in the present case, we are unable to conclude that the evidence objected to could not have been discovered independently of the supposed illegal search. We need not rely on that conclusion alone however, because the record here indicates that the evidence objected to was too attenuated to justify our classifying it as "fruit of the poisonous tree." Defendants also attack the admissibility of the evidence objected to under these assignments of error on the grounds that the copy of the warrant and affidavit admitted into evidence are not properly authenticated. Both state exhibits are properly certified by the issuing authority. These objections are without merit. La.R.S. 15:457.
ASSIGNMENTS OF ERROR NOS. 58 and 63-65 (JENKINS ONLY)
Assignments of error numbers 58 and 63-65 were reserved when the trial court overruled defendant's motion to suppress physical evidence (assignment of error number 58) and permitted the introduction into evidence of a pair of Stetson shoes belonging to defendant, Ezekiel Jenkins (assignments of error 63-65), which was seized during a search of the residence at 437 East Patterson Street in Flint, Michigan.
Testimony adduced at trial established that the residence was that of one Ollie Ree Johnson. The residence was also occupied by defendant, Jenkins, who lived with Ms. Johnson and fathered her child. Prior to searching the residence, F.B.I. agents obtained a written consent to search from Ms. Johnson.
The chief argument advanced by defendants in urging that the trial court erred in permitting the introduction of the shoes is that Ms. Johnson could not consent to the search for personal effects of the defendant. The jurisprudence clearly supports the opposite view that a common-law wife with authority over the premises at the time of the search may validly consent thereto. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Dupuy, 319 So.2d 299 (La.1975); State v. Hubbs, 261 La. 173, 259 So.2d 53 (1972).
Defendant's other argument, that the consent to search was obtained by coercion, is unsupported by the record. No error is *176 demonstrated by these assignments of error.
ASSIGNMENT OF ERROR NO. 57 (WATERS ONLY)
When the trial court overruled a motion for mistrial by counsel for defendant, David Waters, assignment of error number 57 was reserved.
The factual context in which the motion arose is as follows:
F.B.I. Agent James T. Volz testified as to a photographic display which he showed to the two employees of the Cotton Valley Branch of the People's Bank and Trust Company who had witnessed the robbery-murder and a third person who advised officers that she felt that she had seen the car utilized in the bank robbery. Agent Volz further testified that both bank employees picked out the photograph of David Waters and identified him as one of the robbers. On a second photographic display, one of the bank employees also identified a photograph of Ezekiel Jenkins.
On recross-examination, counsel for Jenkins questioned Agent Volz in depth about why David Waters' photograph was included in the display.[2]
When, after repeated questioning without objection by counsel for co-defendant, Ezekiel Jenkins, the witness stated that the photograph of David Waters was included because he had a prior bank robbery conviction and was a suspect in another bank robbery, counsel for Waters objected and moved for a mistrial. The trial court overruled the motion for a mistrial and admonished the jury to disregard the answer.
As the statement subject to objection in this case was made by a witness other than the judge, district attorney or a court official, a mistrial is not mandatory if an admonition is sufficient to assure the defendant *177 a fair trial. La.C.Cr.P. arts. 770-71. The issue is therefore whether the trial court abused the discretion vested in it by La.C.Cr.P. art. 771 in denying the motion for a mistrial. Under the facts of this case, we are of the opinion that the trial court did not abuse its discretion. State v. Lepkowski, 316 So.2d 727 (La.1975); State v. Clark, 288 So.2d 612 (La.1974). The statement made here was not of the gratuitous, unresponsive nature which we found to require a mistrial in State v. Foss, 310 So.2d 573 (La.1975).
ASSIGNMENT OF ERROR NO. 59
Assignment of error number 59 relates to the admission of state exhibits 46-51 (U.S. Savings Bonds, personal checks, Department of Agriculture food coupons, jury warrant and witness certificate and a road map) into evidence over defense objection to the relevancy of the exhibits and the connexity to the crime.
These articles were recovered next to Louisiana Highway 160 about two miles west of the Cotton Valley bank. These articles were identified as having been taken in the bank robbery in which Mrs. Coyle was murdered. Also recovered from the same area was a pistol identified as having been purchased by defendant William Paschal in Atlanta, Georgia.
We find that the items in question were both relevant and reasonably connected to the crime so as to be admissible in evidence. La.R.S. 15:441.
ASSIGNMENT OF ERROR NO. 66 (JENKINS ONLY)
Assignment of error number 66 relates to the denial of a motion for mistrial based upon the allegation that the jury may have overheard an off-the-record discussion between counsel for the State, counsel for defendant Jenkins and the trial judge at the bench during the testimony of Jenkins' common-law wife, Ollie Ree Johnson. Defense counsel in brief argues that the district attorney made a statement during the discussion which could have been overheard by the jury. The substance of the alleged statement was that Jenkins admitted having been involved in a bank robbery in which a woman was shot.
Assuming for purpose of argument only that such a statement was made by the district attorney and overheard by the jury, no prejudice to defendant Jenkins is demonstrated. Ollie Ree Johnson testified without objection by defense counsel during her testimony that defendant Jenkins admitted knowledge of the bank robbery. We find no abuse of discretion on the part of the trial court in denying the motion for a mistrial.
ASSIGNMENT OF ERROR NO. 68
Assignment of error number 68 relates to the admission into evidence of a brown leather jacket worn by defendant Waters at the time of his arrest. The basis for the objection was relevancy.
One of the eye witnesses to the robbery-murder, Mr. John McDonald, testified that one of the robbers (whom he later identified as David Waters) was wearing a brown leather or imitation leather jacket at the time of the robbery.
We find that the evidence admitted had sufficient rational and logical connection with the issue of identity of the accused as to warrant consideration by the jury. La.R.S. 15:441. State v. Freeman, 306 So.2d 703 (La.1975); State v. Giles, 253 La. 533, 218 So.2d 585 (1969).
No error is demonstrated by this assignment of error.
ASSIGNMENT OF ERROR NO. 69
Assignment of error number 69 was reserved when a defense motion for a mistrial was overruled.
The motion for mistrial was made during the testimony of F.B.I. Agent Jack Duvall, who testified as to a statement given to him by defendant Paschal at the time of his arrest in Flint, Michigan. Agent Duvall testified that Paschal admitted going to the bank, sitting in a car in the parking lot, hearing gunshots, and observing a man come out of the side door of the bank into *178 the parking lot and fall. On cross-examination of Agent Duvall, the following exchange took place:
"Q. Let's go back to your testimony about Mr. Paschal, the first thing that he observed at the bank I believe you said was a man coming out of the side door, is that correct?
"A. Yes sir.
"[DISTRICT ATTORNEY]:
"Could we have that read a white man?
"[DEFENSE COUNSEL]:
"No, we don't.
"[DISTRICT ATTORNEY]:
"I will withdraw my objection. I think the gentleman said a white man.
"[DEFENSE COUNSEL]: "Your honor, I move for a mistrial at this time, the District Attorney is making a remark which is prejudicial and violating the law and has no relevancy whatsoever.
"THE COURT:
"Motion for a mistrial is overruled." Record, vol. 9, p. 736.
In order to place the exchange in context, it should be noted that previous testimony established that two men, one white and the other black, exited the side door of the bank. The remark by the district attorney was apparently designed to establish which of these two men the defendant had seen.
La.C.Cr.P. art. 770 makes a mistrial mandatory when a remark is made by the district attorney within the hearing of the jury which refers directly or indirectly to "* * * [r]ace, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury; * * *." Since the remark of the district attorney referred to race, the inquiry is whether the remark was directed to a question that was relevant and material.
Not every reference to race requires the granting of a mistrial. State v. Thomas, 310 So.2d 517 (La.1975). Race may be a valid method of identification and thus material and relevant. State v. Robinson, 261 La. 1029, 261 So.2d 654 (1972).
In reviewing not only the exchange quoted above, but also the entire record, it appears that the prosecution made no attempts to appeal to racial prejudice in this case. The comment by the district attorney appears to have been directed to the relevant issue of identity. We therefore find no abuse of discretion on the part of the trial judge in denying the motion for a mistrial.
ASSIGNMENT OF ERROR NO. 70
Assignment of error number 70 relates to the denial of a new trial requested by the defendants following their convictions. Seven grounds are asserted in support of the motion.
The evidence amply supports the verdict in the face of defendants' first two contentions, i.e., that the State failed to prove specific intent to kill or inflict great bodily harm and that the State failed to prove that the defendants were engaged in an enumerated felony at the time Mrs. Coyle was killed. All of the remaining grounds have been dealt with as specific assignments of error and none has been found to demonstrate reversible error.
ASSIGNMENT OF ERROR NO. 71
Finally, defendants urge as error the trial court's denial of their motion in arrest of judgment on the ground that the imposition of the death penalty constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.
Subsequent to this appeal the United States Supreme Court invalidated the death penalty of La.R.S. 14:30 (1973), As amended by La.Acts 1975, No. 327, § 1, the first degree murder provision passed by the legislature in the wake of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the Court held,
"* * * [T]hat the death sentence imposed upon the petitioner under Louisiana's *179 mandatory death sentence statute violates the Eighth and Fourteenth Amendments and must be set aside. The judgment of the Supreme Court of Louisiana is reversed insofar as it upheld the death sentence imposed upon the petitioner and the case is remanded for further proceedings not inconsistent with this opinion." 428 U.S. at 336, 96 S.Ct. at 3008, 49 L.Ed.2d at 983.
This is not the first time that decisions of the United States Supreme Court have invalidated Louisiana provisions relative to capital punishment. In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and again in Furman v. Georgia, supra, Louisiana statutes were effectively invalidated. Each time this Court was called upon to resolve the question of sentencing defendants validly convicted, but unconstitutionally sentenced to death. In each case we instructed the trial courts to substitute life imprisonment for the death sentence. State v. Mouton, 319 So.2d 331 (La.1975); State v. Frezal, 278 So.2d 64 (La.1973); State v. Payne, 274 So.2d 693 (La.1973); State v. Franklin, 263 La. 344, 268 So.2d 249 (1972); State v. Shaffer, 260 La. 605, 257 So.2d 121 (1971); State v. Duplessis, 260 La. 644, 257 So.2d 135 (1971).
The situation created by the United States Supreme Court's ruling in Roberts v. Louisiana, supra, however, differs from that created by Witherspoon and Furman, because the Louisiana legislature in 1973, in responding to Furman enacted a provision prescribing the penalty for a new second degree murder provision which is even more severe than a simple life sentence:
"Whoever commits the crime of second degree murder shall be imprisoned at hard labor for life and shall not be eligible for parole, probation or suspension of sentence for a period of twenty years. Added by Acts 1973, No. 111, § 1."
If this Court chose to follow precisely the course taken in its Post-Witherspoon and post-Furman decisionsi. e., substitution of simple life imprisonment for the invalid death penaltywe would create an anomalous situation in which the penalty imposed on those validly convicted of first degree murder is less severe than that imposed upon other individuals convicted of second degree murder. Accordingly, we conclude that the appropriate sentence to be imposed upon a valid conviction for first degree murder is the most severe penalty established by the legislature for criminal homicide at the time of the offense, La.R.S. 14:29 et seq., which we may presume to be constitutional in the wake of Roberts v. Louisiana, supra. This penalty is imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years. See La.R.S. 14:30.1, as added by Acts 1973, No. 111, § 1.
For the reasons assigned, the defendants' convictions are affirmed, but the death sentences imposed upon them are annulled and set aside, and the case is remanded to the district court, with instructions to the trial judge to sentence the defendants to imprisonment at hard labor for life without eligibility for parole, probation or suspension of sentence for a period of twenty years.
MARCUS, J., concurs and assigns reasons.
MARCUS, Justice (concurring).
I concur with the decision of the majority in affirming the conviction, vacating the original sentence, and remanding the case with instructions that the defendant be sentenced in accordance with La.R.S. 14:30.1 to life imprisonment at hard labor without eligibility for parole, probation or suspension of sentence for a period of twenty years. However, in my opinion, this substitute sentence should be imposed not because it is the next most severe sentence for a Lesser included offense but because, in seeking the legislative intent, it is clear that for the commission of premeditated murder a sentence at least that onerous is warranted.
NOTES
[1] This is the single exception in which the testifying officer mentioned inadvertently the first name of another co-defendant in relating a confessor's statement. This unintentional reference, in our opinion, does not reach constitutional proportions. Such occasional transpositions of names by witnesses are not uncommon during trials. Considering the context in which it was uttered, it was an obvious error by the witness and did not convey the meaning that the confession had been given by "David" or that he had been referred to by the confessor. Furthermore, only the first name "David" was mentioned, and it is a popular name which has been given to countless persons.
[2] The cross-examination of Agent Volz proceeded as follows:

"BY [DEFENSE COUNSEL]:
"Q. Sir, when did you first learn of this case?
"A. The day it happened, December 19.
"Q. When did you get information identifying these defendants as being suspects?
"A. Sometime during the last week of December of 1973.
"Q. How were you contacted, sir?
"A. By another F.B.I. agent.
"Q. Where?
"A. In Shreveport.
"Q. Did you get any information directly or indirectly from the State of Michigan?
"BY THE COURT:
"I think the witness is entitled to know when you are talking about, Mr. [defense counsel].
"BY [DEFENSE COUNSEL]:
"Well, after he got the information the latter part of December.
"A. If I may clarify the situation, another F.B.I. agent was investigating another matter in Shreveport, involving other bank robberieshe had similar seven photographs which he had obtained or submitted to him from the F.B.I. office in Michigan. After completion of his investigation, he turned these photographs over to me and then I displayed `em to the witnesses in this matter.
"Q. Well, what was the matter that caused you to tender these photographs to Mr. McDonald? It was not by chance was it? When you carried them to `em you had him as a suspect, did you not?
"A. Yes, sir.
"Q. All right, why did you suspect any of these individuals?
"A. Because the photograph involving that of David Waters, he was a suspect in some other matters under investigation of a similar offense.
"Q. At the time you secured his photograph you had no idea that he was [sic] suspect in this matter?
"A. When I secured his photograph I had the idea he was a suspect.
"Q. Why?
"A. Information had been received through the F.B.I. in Flint, Michigan that Mr. Waters had been observed with a large amount of money in his possession. And . . . .
"Q. And what, sir?
"A. . . . because of a prior bank robbery conviction was considered a suspect in another bank robbery."
At this point, counsel for Mr. Waters objected and moved for a mistrial. As can be seen from the context in which the objection came, counsel for David Waters was on ample notice that continued examination of Agent Volz by counsel for co-defendant Ezekiel Jenkins would in all probability elicit information concerning other criminal conduct by defendant Waters. However, since we have found that the trial court did not abuse its discretion in refusing to grant a mistrial, we need not consider whether counsel's failure to object prior to the answer constitutes a waiver of the objection.